**UNITED STATES of America, Appellee,**

v.

**Juan Manuel CAMINOS, Appellant.**

No. 84–3782.

United States Court of Appeals, Third Circuit.

Argued June 17, 1985.

Decided Aug. 16, 1985.

---

**4.** Other contentions asserted by plaintiff are not proper issues for consideration in this action.

J. Alan Johnson, U.S. Atty., Constance Bowden (Argued), Paul J. Brysh, Asst. U.S. Attys., T. Brent McCune, Legal Intern, Pittsburgh, Pa., for appellee.

John L. Doherty (argued), Manifesto & Doherty, P.C., Pittsburgh, Pa., for appellant.

* Honorable Clarkson S. Fisher, Chief Judge of the United States District Court for the District of New Jersey, sitting by designation.

Before ADAMS and HUNTER, Circuit Judges, and FISHER, District Judge.*

**OPINION OF THE COURT**

ADAMS, Circuit Judge.

This case presents the rather novel question whether the Greater Pittsburgh International Airport (Pittsburgh Airport) constitutes a national border for purposes of the Fourth Amendment. While at first blush the answer might seem readily apparent to a student of elementary geography, the question, like so many encountered in the law, takes on a certain complexity in context. The context here is a customs search of a package suspected of containing narcotics; if the Pittsburgh Airport is the "functional equivalent" of a border, the search is legal upon a showing that the package arrived from a foreign point of departure. Defendant Juan Manuel Caminos, convicted of knowingly importing cocaine and possession of cocaine with intent to distribute, appeals his conviction on two grounds: 1) that the search of the package at the airport was illegal; and 2) that the judge's charge to the jury was improper. Because we determine that in the setting here the Pittsburgh Airport is the "functional equivalent" of a border, and because we find that the jury charge was not improper, the conviction will be affirmed.

I.

Caminos was convicted of knowingly importing cocaine, in violation of 21 U.S.C. § 952(a) (1982), and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (1982). He received ten year sentences with a mandatory three year parole term on each count, to be served concurrently.

The conviction arises out of the importation of a wood carving that contained cocaine. The carving was shipped in a package from San Paulo, Brazil to Pittsburgh.

Its label identified the sender as "Manola Caminos," and the recipient as "Caminos Art." The package was sent on July 30, 1984 via Varig Airlines. It arrived first at Kennedy Airport in New York on August 2, 1984; was then transferred to United Airlines, which transported it to Chicago; and was then sent to Greater Pittsburgh International Airport, where it arrived on August 3, 1984 at 9:20 a.m. At all times subsequent to its arrival in New York the merchandise was under a customs bond.

On August 13, 1984, two employees of defendant's brother appeared to claim the package. A customs officer was called in to inspect the package. Suspecting the presence of drugs, he opened the package, drove a nail into a warped area of the carving, and discovered cocaine. The claimants were sent away, because their documents lacked a necessary signature. Customs then turned over the package to the Drug Enforcement Administration (DEA), which replaced the cocaine with an inert substance and a tracking device, and resealed the package. When the claimants returned to pick up the package, DEA agents followed them. The claimants dropped off the package at the office of defendant's brother, where defendant picked it up and brought it to the home of Mr. Idilio Marrotte. The DEA agents then obtained a search warrant and entered the Marrotte house. The package and wood carving were in the living room, the carving intact. Caminos was arrested.

During the trial, Caminos testified that he was an importer of artwork, and that while in Brazil he had been approached by two Brazilian individuals, "Ruy" and "Algemar," who sought to have him send Brazilian artwork to the United States in order to decorate a Brazilian restaurant opening in Miami. Caminos agreed to ship 40 pieces for $200 each, making the total amount worth $8,000.

The package in question was a test run for this venture. Ruy was to pick up the package in Pittsburgh, at defendant's brother's address. This particular carving had a street value of $60. As noted, it was shipped on July 30, 1984. Caminos testified that when he told Ruy and Algemar, on August 5, 1984, that his brother had informed him that the package had not yet arrived in Pittsburgh, they became upset, and proposed that he fly to Pittsburgh and check on it. They paid for his airplane ticket, which cost $650. The delivery fee for the test run had been $400—thus the shipment of this one $60 carving cost Ruy and Algemar over $1,000. Caminos said he considered such an expenditure reasonable in light of the importance of the business venture at stake.

Prior to trial, the defendant filed a motion to suppress the evidence obtained in the customs search at the Pittsburgh Airport. He contended that the search was unlawful because it did not take place at a border, and it was conducted without a search warrant. He further argued that the subsequent search at the Marrotte residence was the fruit of the first unlawful search. The trial court denied the motion, holding that the search at the Pittsburgh Airport was conducted at the functional equivalent of a border, and thus no search warrant was required. At trial, Caminos offered as a defense that he did not know the package contained cocaine. The court instructed the jury it could find him guilty, even in the absence of proof of his knowledge, if it found Caminos had deliberately ignored the high probability that the carving contained an illegal substance. Following his trial and conviction, Caminos filed an appeal, challenging the district court's decision not to suppress the evidence obtained in the airport search, and also challenging the jury charge.

## II.

The Fourth Amendment to the United States Constitution requires that in general searches must be conducted pursuant to a warrant based on probable cause. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Courts recognize an exception to this rule, however, for border searches, based on the sovereign's historical right to police its bor-

ders and to examine persons and property entering the country.

Thus, it is well settled that border searches are valid without a warrant or a showing of probable cause where the searched person or item is shown to have crossed the border, where there has been no opportunity for the object or person to have materially changed since the crossing, and where the search is conducted at the earliest practicable time and place. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); *United States v. Garcia*, 672 F.2d 1349, 1363–64 (11th Cir.1982). Border searches are legitimate not only at the physical boundaries of the nation, but also at the "functional equivalent" of the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973). In *Almeida-Sanchez* the Supreme Court suggested that the St. Louis Airport would be the "functional equivalent" of the border were it the first point of landing of a nonstop flight from abroad. *Id.*

A related exception to the Fourth Amendment warrant requirement concerns "extended border searches." An extended border search takes place *after* the first point in time when the person or package might practicably have been stopped and searched. *United States v. Niver*, 689 F.2d 520, 526 (5th Cir.1982). It requires the same showing as a border search, but because it entails a greater intrusion on legitimate expectations of privacy, it also requires a showing of "reasonable suspicion." 689 F.2d at 526; *see also United States v. Richards*, 638 F.2d 765, 772 n. 4 (5th Cir.) (additional requirement is imposed because, unlike routine border searches, an extended border search may stigmatize the individual searched, is unexpected, and involves greater invasion of privacy), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).

The first issue that is presented here, then, is whether the Pittsburgh Airport constitutes the "functional equivalent" of the border. If it does, the airport search was not invalid, since there is no dispute that the package arrived from a foreign point of departure. Defendant concedes, as he must, that had customs officials conducted the search in the New York Airport, when the package first arrived, that would have been a legitimate border search. *See United States v. Scheer*, 600 F.2d 5 (3d Cir.1979). The question is whether one may still consider Pittsburgh the "functional equivalent" of the border even though the package was transported there by way of New York and Chicago. It appears to be the practice of the customs officials to search many packages at the international airport nearest their final destination, holding them under a customs bond in the meantime. That practice was followed here.

Two courts of appeals have directly addressed the question of a delayed border search. In *United States v. Sheikh*, 654 F.2d 1057 (5th Cir.), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1981), a package was sent from out of the country to the Dallas-Fort Worth (DFW) Airport, with an intermediate stop in Houston. The package arrived first in Houston, and was then shipped by an American Airlines truck to the DFW terminal. It was under a customs bond from the time it arrived in Houston to the time it was searched, five days later at DFW. Under the circumstances, the court held that where the package's final destination was Dallas, where it had not been tampered with prior to search, and where it was under a customs bond from the time it entered the country in Houston, DFW was the functional equivalent of a border, and the search was valid. *Id.* at 1069–70. The court noted that "for all practical purposes, the package reached the end of a 'nonstop' flight when it arrived at DFW." *Id.* at 1070. The Fourth Circuit reached a similar result involving a Volkswagen camper shipped from Portugal to Norfolk, Virginia via Baltimore. *See United States v. Gallagher*, 557 F.2d 1041, 1044 (4th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 213, 54 L.Ed.2d 148 (1977). We follow these Circuits by concluding that the

Pittsburgh Airport is the "functional equivalent" of a border for purposes of this case, where the package's final destination was Pittsburgh, there was no evidence that the package was materially altered subsequent to its arrival in the United States, and the Pittsburgh Airport was the earliest practicable place to search the goods.

While it may seem that the first practicable place to conduct the search was New York, practicability must be viewed realistically. Requiring that all imported packages be searched at their first point of entry, even where immediately forwarded under customs bond to their final destination, would place unreasonable burdens upon customs officials. When there is no evidence that the package has been materially changed,[1] and when the package's transportation to its stated final destination from the initial point of entry has been under a customs bond, there would appear to be no reason not to allow border searches to be conducted at the destination point rather than at the point of entry.

 Accordingly, we reject defendant's contention that the search violated the Fourth Amendment because it was conducted without a warrant based on probable cause. Alternatively, Caminos maintains that the search should be considered an "extended border search," and that the government failed to establish the requisite "reasonable suspicion" to justify the search. This argument fails because none of the reasons advanced in the case law for requiring a showing of "reasonable suspicion" in extended border searches applies here. As noted above, the "reasonable suspicion" showing is justified where the later search is unexpected, or entails a greater intrusion on expectations of privacy.

Where a package is searched while still under customs bond and prior to its delivery to the addressee, these concerns are not implicated. Indeed, the case upon which defendant relies specifically restricts the "reasonable suspicion" requirement to searches that occur "after delivery of the [package] to the addressee." *United States v. Richards*, 638 F.2d at 773.[2]

The district court, therefore, did not err in declining to suppress evidence obtained in the customs search at the Pittsburgh Airport.

### III.

Caminos's only line of defense at trial was that he was unaware that the package contained cocaine. The district judge instructed the jury that it could find defendant guilty, even if there was no proof of knowledge on the part of the defendant, if it concluded beyond a reasonable doubt that Caminos deliberately closed his eyes to a high probability that the wood carving contained an illegal substance. The defendant objected to this instruction, and now urges it as a ground for appeal.

 The charge, known as a "deliberate ignorance" charge, originated in *United States v. Jewell*, 532 F.2d 697 (5th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). Caminos correctly argues that the judge's version of the "deliberate ignorance" instruction must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability. *See United States v. Valle-Valdez*, 554 F.2d 911, 914 (9th Cir. 1977). Thus, we must review the judge's

1. Defendant notes a discrepancy between the package weight as recorded in Brazil—28.16 pounds—and that recorded in New York—29 pounds. But such a differential is significant only when there is evidence suggesting that the package was tampered with *after* its arrival in the United States. No such evidence was presented here.

2. Were we to review the search under the "extended border search" standard, it might be

concluded that reasonable suspicion was established here, on the basis of the customs agent's testimony regarding the factors that caused him to suspect smuggling: e.g., the package came from Brazil, was sent by defendant to himself, was described as handicrafts, often a cover for narcotics, and had no declared value for customs. App. 15a–16a. Because we apply the border search standard, however, we do not reach this question.

charge to ensure that he emphasized the necessity of proving a subjective awareness. The relevant portion of the charge is as follows:

> Now, with respect to these matters, the defendant, of course, denies that he knew there was cocaine. Now, since you cannot look inside the defendant's mind to ascertain his intent, you must infer that intent and that knowledge from his acts and words at the time of the commission or from the surrounding facts and circumstances shown by the evidence. In that connection, the element of knowledge may be satisfied by inferences from the proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. When knowledge of the existence of a particular fact is an element of the offense, such knowledge is established if a person is aware of a high probability of its existence and then fails to take action to determine whether it is true or not. If the evidence shows you that he actually believed that no cocaine existed, he cannot be convicted. Nor can he be convicted for being stupid or negligent or mistaken. More is required than that. A defendant's knowledge of a fact may be inferred from willful blindness to the existence of facts which indicate that there is a high probability that some forbidden or illegal substance may be contained therein. And it is the jury's function to determine whether or not there was a deliberate closing of the defendant's eyes to the inferences, the conclusions to be drawn from the evidence here.
>
> To repeat again, if the evidence shows that he positively did not know, then, of course, he must be acquitted. And if the evidence indicates that he was very stupid in the action he took, or ignorant, he cannot be convicted. But if the evidence shows that there was a high probability that he knew something was amiss and that he failed to take steps to investigate, to find out whether that was true or not, then you may find that he had the guilty knowledge which is required for conviction of the offense of importing a controlled substance.

App. 692a–693a.

■ A fair reading demonstrates that the "deliberate ignorance" charge satisfies the requirements of a legitimate *Jewell* instruction. The judge's directions did not suggest a "reasonableness" standard, repeatedly warned that stupidity or negligence are not sufficient to show the "willful blindness" required, and focused on the defendant's subjective awareness.

■ Defendant also claims that the charge was not warranted by the facts of this case. The record, however, reveals that defendant was approached by two individuals who were eventually willing to pay over $1,000 to ensure that a $60 wood carving was delivered to Pittsburgh. The government maintains that this case is very similar to *United States v. Suttiswad*, 696 F.2d 645 (9th Cir.1982), in which a relative stranger gave defendant, a taxicab driver in Thailand, a plane ticket to the United States, clothing, cash, gifts for his family, and a heavy suitcase to carry. The suitcase turned out to contain a large amount of heroin. The court in that case held that an inference of deliberate ignorance was warranted by the facts. While the present case is not quite as blatant, the disproportionate amount of money expended to deliver the wood carving was sufficient to allow the jury to determine that defendant deliberately ignored the probability that something other than a $60 wood carving was involved.

## IV.

Because we find no reversible error in either the denial of suppression or the jury charge, defendant's conviction will be affirmed.