**UNITED STATES of America, Appellee,**

v.

**Jorge William GAVIRIA and Victor Contreras, Defendants-Appellants.**

**Nos. 1506, 1521, Dockets 85–1463, 86–1002.**

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 1986.

Decided Nov. 21, 1986.

---

Debra D. Newman, Brooklyn, N.Y., Asst. U.S. Atty. for the E.D. of N.Y. (Andrew J. Maloney, U.S. Atty. for the E.D. of N.Y., Allyne R. Ross, Jane Simkin Smith, Asst. U.S. Attys., of counsel), for appellee.

Peter Fabricant, New York City (Paul E. Warburgh, Jr., Axelrod & Warburgh, of counsel), for defendant-appellant Gaviria.

Richard Levitt, New York City, for defendant-appellant Contreras.

Before PRATT and MINER, Circuit Judges, and RE, Chief Judge, United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

RE, Chief Judge:

Jorge William Gaviria and Victor Contreras, appeal from judgments of conviction following separate jury trials in the United States District Court for the Eastern District of New York. Both were convicted of conspiracy to possess cocaine with the intent to distribute, and of attempted possession of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1982), and 18 U.S.C. § 2 (1982). Gaviria was also convicted of unlawful importation of cocaine into the United States, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2. Gaviria was sentenced to concurrent terms of 6 years imprisonment on each count, to be followed by a special parole term of 10 years. Contreras was sentenced to concurrent terms of 3 years imprisonment on both counts against him, to be followed by a special parole term of 5 years.

Appellants contend that the district judge erred in denying their pretrial motion

to suppress evidence which, they allege, was illegally obtained. Initially, appellants contend that the search by Customs was not at the border or its functional equivalent, and that Customs did not possess "reasonable cause to suspect" a violation of the law before it searched the shipment. Appellant Gaviria further contends that the district court improperly concluded that there was probable cause for his warrantless arrest. In addition, appellant Contreras contends that the government's proof to establish a conspiracy was insufficient as a matter of law. Appellants also allege that numerous evidentiary and other errors were committed at the trial.

Since this court finds all contentions of appellants to be without merit, the judgments of conviction, the prison sentences and the imposition of the special parole terms ordered by the district court, are affirmed.

*The Facts*

A shipment, described as containing 70 cartons of canned fruit, was sent from Medellin, Colombia, to John F. Kennedy International Airport (JFK), in New York City. The air waybill, which accompanied the shipment, identified "Tropical Food Imported Company," a nonexistent company or entity, as the importer of the canned fruit. "Jorge Guevara" was designated on the air waybill as the consignee. When the shipment arrived at Miami International Airport on May 8, 1985, U.S. Customs officials inspected 7 of the 70 cartons. The customs inspectors did not find anything suspicious, and they resealed the seven cartons with special customs tape, which indicated that the cartons had been opened and inspected. The 70 cartons were, thereafter, transported from Miami International Airport to JFK Airport by a bonded truck carrier.

The shipment arrived at JFK on May 13, 1985, and the cartons were secured at an airport container station to await final customs inspection. After its arrival in the United States, the shipment was, at all times, under a customs bond.

On May 16, 1985, customs inspectors at the JFK airport container station examined the imported cartons of canned fruit. Upon opening one can, the inspectors discovered a quantity of cocaine wrapped in latex. The inspectors then examined the entire 70–carton shipment. The inspection revealed that 12 cans, concealed within 2 cartons, contained a total of 6.71 pounds of cocaine. The two cartons which contained the cocaine had not been inspected in Miami.

During the inspection at JFK, appellant Contreras arrived at the airport to claim the shipment. After the inspection was completed, the inspectors, who were aware that Contreras was waiting to claim the shipment, approached the van in which Contreras was seated. Upon seeing the approaching inspectors, Contreras attempted to exit the airport, but the van's path was blocked by a truck. Contreras proceeded to back up, and then stopped when one of the customs inspectors identified himself. In response to the inspector's request for identification, Contreras produced rental papers which showed that he had rented the van, customs papers which entitled the bearer to take delivery of the shipment, and an invoice which indicated that he had paid the customs brokerage fee the previous day. Contreras denied any knowledge of the contents of the shipment, and said that he had planned to deliver the shipment to the address on the delivery order. Thereafter, Contreras was arrested by Drug Enforcement Administration (DEA) agents.

Contreras agreed to assist the agents in a controlled delivery to "Jorge Guevara," the named consignee of the shipment. Contreras informed the agents that "Guevara" had financed the operation, and that "Guevara" had instructed him to deliver the shipment to the corner of 84th Street and Northern Boulevard, Queens, in New York City. If no one was at the Queens location, Contreras was to deliver the shipment to a residence in the Bronx.

When no one appeared at the Queens location to accept the delivery, Contreras,

accompanied by DEA agent Randall, drove to the Bronx residence. Contreras parked the van in front of 2520 Maclay Avenue, the residence of Jorge Gaviria, and sounded his horn. Gaviria, who matched Contreras' description of "Guevara," met with Contreras at the parked van. After a brief conversation between Contreras and Gaviria, agent Randall gave a pre-arranged signal to the other DEA agents on the scene, and Gaviria was arrested.

Three questions are presented on this appeal: (1) whether a customs inspection of the 70 cartons at the final destination of the shipment in New York City is a valid border search when the goods first entered the United States in Miami; (2) whether there was probable cause for the DEA agents to arrest Gaviria without a warrant; and (3) whether the evidence was sufficient to support Contreras' conviction for conspiring to possess cocaine.

The court holds that the border search and the subsequent arrest of Appellant Gaviria were valid. Since the court also holds that the evidence was sufficient to sustain Contreras' conviction of conspiracy, and that all other contentions are without merit, the judgments of conviction are affirmed.

## BORDER SEARCHES

The court must determine whether, for the purpose of a border search, JFK International Airport in New York may be considered the functional equivalent of the border, even though the shipment was transported there by truck from Miami, the initial port of entry. If JFK constitutes the functional equivalent of the border, then the search at JFK was valid because there is no dispute that the 70 cartons were sent from Colombia, a foreign point of departure. Since the court has concluded that JFK was the functional equivalent of the border, the court holds that the customs inspection at JFK in New York City was a valid border search, and that the evidence obtained as a result of that search was properly admitted at the trial.

The fourth amendment of the Constitution protects "[t]he right of the people to

be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const.amend. IV. It is well established, however, that searches of persons or property at the nation's borders are considered "reasonable" within the meaning of the fourth amendment simply because they occur at the border. *See, e.g., United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). As Chief Justice Rehnquist emphasized in *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985):

> Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.

*Id.* at 3309; *see also id.* at 3318 (Brennan, J., dissenting) ("the power of Congress to authorize wide-ranging detentions and searches *for purposes of immigration and customs control* is unquestioned") (emphasis in original). Pursuant to 19 U.S.C. § 1582 (1982), and implementing regulation, 19 C.F.R. § 162.6 (1986), the Customs Service is authorized to conduct routine border searches.

The authority to conduct a border search is based upon the inherent "right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey,* 431 U.S. at 616, 97 S.Ct. at 1978; *see United States v. Glasser,* 750 F.2d 1197, 1201 (3d Cir.1984), *cert. denied,* 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 & 471 U.S. 1068, 105 S.Ct. 2148, 85 L.Ed.2d 504 (1985). In *United States v. 12 200–Ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), Chief Justice Burger stated that,

> Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, comprehensive

powers "[t]o regulate Commerce with foreign Nations." Art. 1, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry. *Id.* at 125, 93 S.Ct. at 2667; *see United States v. Montoya de Hernandez,* 105 S.Ct. at 3309; *United States v. Thirty-seven Photographs,* 402 U.S. 363, 376–77, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971).

The broad authority of customs officials to conduct warrantless border searches without probable cause is clear. The question now presented, however, is what constitutes the border for the purpose of a border search? The courts that have addressed this question have distinguished two concepts: (1) the "extended" border and, (2) the "functional equivalent" of the border. *See, e.g., United States v. Caminos,* 770 F.2d 361, 364 (3d Cir.1985). Appellants contend that since the shipment arrived and entered in Miami, and was shipped, by truck, 1500 miles to New York, a customs search 8 days later was neither at the border nor "its 'functional' or 'extended' equivalent." The government contends that appellants' arguments "blur the distinction between 'extended border searches' and searches 'within the functional equivalent of the border.'"

■■■ An "extended" border search is a search that usually is conducted after a person or some property has "cleared an initial customs checkpoint and [has] entered the United States." *United States v. Glaziou,* 402 F.2d 8, 13 (2d Cir.1968) (dictum), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). An extended border search does not require a warrant, but, due to the "greater intrusion on legitimate expectations of privacy, [it is] permitted only if supported by reasonable suspicion." *United States v. Niver,* 689 F.2d 520, 526 (5th Cir.1982) (citing *United States v. Richards,* 638 F.2d 765, 772 (5th Cir.), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669 (1981)).

■■■ In this case, since the shipment had not yet been cleared by Customs in Miami, and, therefore, had not "entered the United States," the search was not an extended

border search. Consequently, the customs officials in New York were not required to establish a reasonable suspicion to suspect a violation of the law prior to their inspection of the shipment.

What is the border, for purposes of a customs search, is not always a simple question, because border searches do not necessarily have to take place at the physical boundaries of the nation, but may take place at the "functional equivalent" of the border. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). For example, an airport that serves as the final destination for a nonstop flight may be deemed to be the functional equivalent of the border because of:

(1) the existence of reliable indications that the thing to be searched is of international origin and has not been changed in any way since entering the United States; and (2) the degree of regularity with which searches at the point in question are conducted such that the intrusion is minimal, the existence and function of the checkpoint are known in advance, and there is little discretionary enforcement activity.

*United States v. Sheikh,* 654 F.2d 1057, 1069 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982).

Appellants contend that Miami International Airport served as the functional equivalent of the border, because the shipment of the 70 cartons first arrived in Miami. Appellants also contend that, since the customs search was delayed until the transportation of the shipment from Miami to New York, the final search at JFK was not at the functional equivalent of the border. Hence, appellants contend that the customs officials needed reasonable cause to suspect a violation of law before they could inspect the shipment in New York. These contentions are without merit.

In this case, the court must determine whether JFK Airport in New York can be considered the functional equivalent of the border, even though the final customs inspection was delayed when the shipment

was sent from Miami to New York. Whether a delay in a final customs inspection affects the court's determination of what constitutes the functional equivalent of the border is a question of first impression for this court. Three other courts of appeals, however, have had occasion to address this issue.

In *United States v. Gallagher*, 557 F.2d 1041 (4th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 213, 54 L.Ed.2d 148 (1977), a camper was sent from Lisbon, Portugal, by ship, and arrived in the United States at the port of Baltimore. The camper, which was sealed upon its arrival, and in the custody of Customs at all times, was transported to its final destination of Norfolk, Virginia, by a private trucking company. In Norfolk, a customs inspection, authorized pursuant to 19 U.S.C. § 482, uncovered a quantity of hashish hidden in the camper's gas tank. The defendant contended that the search was unlawful because "customs officials could not invoke their statutory authority to conduct border searches in order to avoid the otherwise applicable more stringent requirements of the Fourth Amendment." *Id.* at 1043.

The Court of Appeals for the Fourth Circuit held that "Norfolk was the border for purposes of § 482." In sustaining the search as a border search the court gave the following reasons: (1) the camper was sent under bond from Lisbon to Norfolk via Baltimore; (2) its intended destination was Norfolk; (3) it never left the official custody of Customs; and (4) there was no evidence of any tampering with the camper. *Id.* at 1044.

In *United States v. Sheikh*, 654 F.2d 1057 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982), a package was flown from Iran to Houston, Texas. The package, under a customs bond, was transported by truck from Houston to its final destination at Dallas-Fort Worth Airport (DFW). At DFW Airport, a customs search revealed that the package contained a Koran, in which was concealed 4.4 pounds of heroin. Defendant contended that the search at DFW Airport was not a valid border search because the package first entered the United States at Houston.

The Court of Appeals for the Fifth Circuit held that, for the purpose of the customs search, DFW Airport was the functional equivalent of the border. *Id.* at 1069. The court cited factors similar to those in the *Gallagher* case, and concluded that "[f]or all practical purposes, the package reached the end of a "nonstop" flight when it arrived at DFW." *Id.* at 1070.

In the most recent case which considered the effect of a delayed border search, *United States v. Caminos*, 770 F.2d 361 (3d Cir.1985), a wood carving that concealed cocaine was shipped from San Paulo, Brazil, to its final destination at the Greater Pittsburgh International Airport. The package first arrived in the United States at New York's JFK Airport, and was placed under a customs bond. The package was then flown to Chicago, and from there was flown to Pittsburgh where a customs inspection, 11 days after its arrival, disclosed the cocaine. The defendant contended that the search was unlawful because it did not take place at a border. The Court of Appeals for the Third Circuit held that the Pittsburgh Airport was the functional equivalent of the border, and that the search was a valid border search. *Id.* at 364–65. In reaching this conclusion, the court stated that:

> When there is no evidence that the package has been materially changed, and when the package's transportation to its stated final destination from the initial point of entry has been under a customs bond, there would appear to be no reason not to *allow border searches to be conducted at the destination point rather than at the point of entry.*

*Id.* at 365 (footnote omitted) (emphasis added).

■ These cases illustrate the broad power of the customs authorities to search packages at the border or its functional equivalent. The cases also reveal that the courts have endeavored to sustain Customs' established practice of conducting routine border searches at the customs station closest to the final destination of the goods. *See United States v. Caminos*, 770

F.2d at 364. The courts, however, have established certain safeguards to protect importers from unreasonable searches. Thus, when goods physically enter the United States at one port, and are subsequently transferred to another port of entry, then the final port of entry will be considered the functional equivalent of the border for the purposes of a customs search, only if: (1) it is the intended final destination of the goods; (2) the goods, upon arrival, remain under a customs bond until a final search is undertaken by Customs; and (3) there is no evidence that anyone has tampered with the goods while in transit. *See, e.g., United States v. Caminos,* 770 F.2d at 365; *United States v. Gallagher,* 557 F.2d at 1044.

■ In this case, as indicated by the air waybill, there is no question that JFK Airport was designated as the final destination of the shipment of canned fruit sent from Colombia. The shipment, upon arrival in Miami, was placed under a Customs bond before it was shipped to New York. The record also reveals clearly that there was no evidence that anyone had tampered with the shipment, and that, except for the seven cartons inspected in Miami, none of the boxes had been opened before the final search at the intended final destination at JFK Airport.

■ Appellants, nevertheless, contend that since seven cartons were opened by Customs in Miami, this fact is proof that the shipment had already undergone a border search. In addition, appellants contend that the government has failed to prove that the shipment was not tampered with while in transit to New York. The court finds these contentions to be without merit.

The cases teach that, if the rights of the importer have been protected by certain safeguards, then the courts will "allow border searches to be conducted at the destination point rather than at the point of entry." *United States v. Caminos,* 770 F.2d at 365. None of the reasons that justify upholding Customs' established practice of conducting the border search at the customs station closest to the final destination are nullified by any preliminary or cursory search at the initial point of entry. Hence, in this case, it is not crucial that an inspection of 7 of the 70 cartons took place in Miami. A search of one-tenth of the total shipment was not considered to be a final inspection by Customs and, indeed, did not result in a final customs clearance.

What took place in this case followed the customs practice of giving final clearance at the container station closest to the final destination of the shipment. The JFK Airport container station was a customs location where routine inspections of foreign shipments were made before delivery to their consignees. Appellant Gaviria knew this, and he engaged a New York customs broker to prepare the necessary documents for presentation to Customs so that a routine customs inspection of the shipment could take place at JFK.

Notwithstanding the initial search of the seven cartons, Customs adhered to its policy of making the final inspection at the customs station closest to the final destination of the goods. The important question that must be answered, therefore, is whether there has been compliance with the necessary safeguards designed to protect the rights of the importer. The facts leave no doubt that, although the shipment entered Miami, its ultimate destination was JFK International Airport. Prior to its final inspection, the shipment was, at all times, under a customs bond. There was no proof of any irregularity, and the seven cartons opened in Miami were resealed with a special customs tape. It is clear that sufficient precautions were taken to ensure the security of the shipment before the final customs search was conducted at JFK.

Therefore, on the facts presented, this court holds that the warrantless customs inspection was made at the functional equivalent of the international border and, therefore, was a valid border search pursuant to 19 U.S.C. § 1582, and 19 C.F.R. § 162.6.

## ARREST OF APPELLANT GAVIRIA

Gaviria contends that his warrantless arrest by DEA agents was not supported by

probable cause, and that the district court erred in denying his motion to suppress his post-arrest statements. He urges that the DEA agents improperly relied on the information supplied by Contreras. In support of his contention, he states that Contreras was an unknown informant who had not provided accurate and reliable information in the past, and, therefore, Contreras' statements could not be used to support the opinion of the DEA agents that probable cause existed for the arrest of Gaviria.

█ Contreras, however, was more than an informant. At the time of the arrest, Contreras was a participant who had information that connected the shipment of cocaine to Gaviria. As this court has recognized, a criminal participant or witness to a crime "need *not* be shown to have been previously reliable before the authorities may rely on his statements." *United States v. Rueda,* 549 F.2d 865, 869 (2d Cir.1977) (emphasis in original); *see United States v. Miley,* 513 F.2d 1191, 1204 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975). In this case, it is unrealistic to regard Contreras as a mere "informant." Consequently, the DEA agents properly relied on the information provided by Contreras in establishing probable cause to arrest Gaviria.

█ Since the statements were properly relied on, the court must now determine whether those statements, combined with other corroborative facts, provided the DEA with probable cause to arrest Gaviria.

The authorities establish that there is probable cause for a warrantless arrest when, at the time of the arrest, the officer has knowledge of facts and circumstances which are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). In each case, the officer on the scene must decide whether there is probable cause for a warrantless arrest. If the validity of the arrest is challenged, it is for the court to determine whether, at the time of the arrest, the objective facts available to the officer, were sufficient to justify a reasonable be-

lief that an offense had been or was being committed. *See Beck v. Ohio,* 379 U.S. at 96, 85 S.Ct. at 228.

This court has noted that "evidence sufficient to show probable cause by corroborating even a previously unknown informant may be found in circumstances which do not actually establish the crime itself." *United States v. Rueda,* 549 F.2d at 870; *see United States v. Sultan,* 463 F.2d 1066, 1069 (2d Cir.1972). Although Gaviria's conduct may perhaps appear innocent on its face, the probable cause standard " 'does not deal with hard certainties, but with probabilities.' " *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

The facts indicate that Contreras met Gaviria at the Bronx address just as he had predicted, and that Gaviria matched the physical description of "Guevara" that Contreras had given to the DEA agents. During the conversation between the two defendants, reference was made to the inspection by Customs, and Contreras responded that there had been "no problems." In addition, during the conversation, agent Randall observed that Gaviria frequently looked at the cartons in the back of the van. The time when the arrest was made it also significant since it occurred immediately after Gaviria had instructed Contreras to enter his house, where both defendants would be out of the sight of the DEA agents. Furthermore, since Contreras, contrary to instructions, engaged in a conversation in Spanish with Gaviria, which Officer Randall could not understand, it was reasonable for Officer Randall to believe that the defendants would attempt to flee once they entered the building.

Under the totality of the circumstances presented in this case, the court holds that sufficient objective facts existed to find probable cause that Gaviria had committed an offense, and that the DEA agents were justified in arresting him. Since there was probable cause to arrest Gaviria, his post-

arrest statements were properly admitted into evidence against him.

## SUFFICIENCY OF THE EVIDENCE

██ Appellant Contreras contends that the evidence against him was insufficient to support his conspiracy conviction, and, therefore, the conviction on that count should be vacated. A heavy burden is placed upon a defendant who claims that the evidence is insufficient to support a conviction. *See United States v. Khan,* 787 F.2d 28, 33 (2d Cir.1986); *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). The question presented for the court is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Indeed, courts have also noted that "[p]ieces of evidence must be viewed not in isolation but in conjunction, and the reviewing court must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *United States v. Khan,* 787 F.2d at 34. The standard of review applied in these cases assures that the reviewing court will not substitute its own determinations or findings for those of the jury. *See United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984).

A conviction for conspiracy requires that the jury find, beyond a reasonable doubt, that the defendant participated in the conspiracy, and not that he merely associated with the conspirators. *See United States v. Martino,* 759 F.2d 998, 1002–03 (2d Cir. 1985). The law is clear that "the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence." *Id.* at 1002. What is pertinent here is that "[s]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general." *United States v. Mariani,* 725 F.2d at 865–66. In a case in which the evidence supports a reasonable inference that prior

arrangements had been made, and that a working relationship existed between the defendant and the alleged co-conspirators, this court has held that the evidence is sufficient to support a finding of a conspiracy agreement. *See United States v. Brown,* 776 F.2d 397, 402–03 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

A review of the evidence introduced against Contreras reveals that there was ample evidence to support the conspiracy conviction. The evidence established that Contreras lied when he stated to the DEA agents that he did not know Gaviria. Contreras' association with Gaviria was confirmed by the fact that he lived in a house owned by Gaviria, and that they attended high school together. The evidence also showed the existence of prior arrangements between Contreras and Gaviria. Contreras had received money from Gaviria to rent a van, and to pay the brokerage fee on the shipment. At Gaviria's request, Contreras inquired about the shipment the day before he was arrested. Contreras' complicity with Gaviria was further established by the fact that it was Contreras who was to deliver the shipment to Gaviria. For this purpose, Contreras possessed the necessary documents to take possession of the shipment. In addition, the customs broker hired by Gaviria was given Contreras' home telephone number as the number for the fictitious "Tropical Food Imported Company." Finally, the jury could also have inferred from Contreras' attempted flight from the airport that he knew of the contents of the shipment.

It is the function of the jury to determine the facts from the evidence presented, and to draw reasonable inferences from their findings. After a careful review of the evidence presented, the court holds that the jury could have found and properly determined that a conspiracy existed to distribute cocaine, and that Contreras was an active, willing, and knowing participant.

## CONCLUSION

In view of the foregoing, the court holds that: (1) the customs search of the ship-

ment, consisting of 70 cartons, was a valid border search; (2) since Gaviria's warrant-less arrest was based on probable cause, the district court correctly denied his motion to suppress; (3) appellant Contreras' conviction for conspiracy was supported by sufficient evidence; and (4) all other contentions have been considered and are without merit. Finding no error, the judgments of conviction, are

AFFIRMED.