## UNITED STATES of America

v.

## Archibald J. MacKENZIE and Eldon R. Head, Defendants.

### No. CR–89–157C.

United States District Court,
W.D. New York.

March 23, 1990.

Reconsideration Denied June 28, 1990.

Dennis C. Vacco, U.S. Atty. (Thomas S. Duszkiewicz, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for U.S.

Condon, LaTona, Pieri & Dillon (John P. Pieri, of counsel), Buffalo, N.Y., for defendant MacKenzie.

Lipsitz, Green, Fahringer, Roll, Schuller & James (Herbert L. Greenman, of counsel), Buffalo, N.Y., for defendant Head.

**586**

CURTIN, District Judge.

Defendants Archibald J. MacKenzie and Eldon R. Head have been charged in a two-count indictment with possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute, pursuant to 21 U.S.C. §§ 841(a)(1) and 846.

A suppression hearing was held, and briefs and oral argument have been considered. The following constitutes the court's findings of facts and conclusions of law.

## FACTS

On September 13, 1989, a vehicle registered in Nova Scotia and driven by defendant MacKenzie passed through the primary inspection area at the Lewiston–Queenston Bridge. The officer at the primary station did not send the vehicle for further screening to the secondary-inspection area.

At that time, Inspector John Knox of the United States Customs Service was in a marked customs vehicle with two other officers not far from the primary inspection line, and he was able to see MacKenzie's car leave the primary inspection area. As MacKenzie's car left the customs area and began to enter the New York State Thruway, it appeared to Inspector Knox that the car "took off real quick." (Transcript ("Tr.") at 7). They followed the vehicle onto the thruway which, at that point, skirts the City of Niagara Falls and eventually crosses the Niagara River at the North Grand Island Bridge.

Knox testified that as they followed the vehicle it speeded up and changed lanes, and that the driver was tapping his fingers on the back of his seat and adjusting his position behind the wheel. Knox and his fellow officers eventually made a judgment that the vehicle should have been "secondaried" back at the Lewiston–Queenston Bridge (Tr. at 8). A license-plate check revealed that the border crossing they had witnessed was the first for this vehicle and that the car was registered to a "Mr. MacKenzie," a person that Knox assumed was defendant MacKenzie's father (Tr. at 8–9,

29–30). At no time before the defendants were arrested did any of the several law-enforcement officers involved in surveillance of MacKenzie's car check with the primary-inspection station to determine why the vehicle had not been sent for a secondary inspection. Furthermore, Knox did not claim that the car was being driven at an excessive speed or in a reckless manner.

Finally, as the vehicle approached the toll booth at the North Grand Island Bridge, about eleven or twelve miles from the Lewiston–Queenston Bridge, the agents pulled the car over for the purpose of conducting a secondary inspection. At that time, they learned that the driver of the car was Archibald MacKenzie, who produced a driver's license. They were then able to make a further identification check and learned that MacKenzie previously had been arrested on a drug-related offense in Canada. Knox testified that the agents believed that this fact rendered MacKenzie excludable from the United States (Tr. at 8–12, 51–54). Knox testified that he had no information indicating that MacKenzie had any convictions (Tr. at 30–31, 49–50).

MacKenzie told the officers that he was on his way to pick up his mother at the Buffalo International Airport or the Days Inn near the airport (Tr. at 12–16, 33–34, 51–52). In addition to questioning MacKenzie about the purpose of the visit, the agents also made an extensive search of his vehicle. Inspector Knox described it as follows:

A  We looked underneath the dashboard, reached up underneath the dashboard, opened the glove box, went through the glove box, checked to see if it was loose, pulled the ash tray out, checked that area, went underneath the seats, saw that the rugs were loose, checked underneath the rugs. Went to the back of the vehicle. There was some kind of a curtain made there to block view, so we lifted that up, got it out of the way. In the back of the vehicle the rug was loose, we pulled the rug up all over, checked underneath,

checked in the wheel-well on all sides of the vehicle and looked underneath to see if there was a new gas tank or any evidence that the gas tank had been tampered with, opened the hood, went underneath the hood, checked all the areas that can fit contraband, checked the air cleaner.

Q That general area?

A Did a very thorough search.

Q How long did the search take, Mr. Knox?

A I would say upwards of 15 minutes. (Tr. at 46.) They also searched MacKenzie's person (Tr. at 33). No contraband was found anywhere (Tr. at 33).

During the search, a driver's license for another individual was found in the vehicle. A check on this individual's name revealed that he "was also excludable with drug records in Canada" (Tr. at 12).

The customs agents then contacted the United States Border Patrol, told them what they had learned, and asked for advice concerning how to proceed. The border patrol agents requested that the customs agents permit the vehicle to continue on its way to see if MacKenzie was, in fact, going to the airport to pick up his mother. It was agreed that the border patrol would cooperate in the surveillance. At that time, their theory was that MacKenzie and perhaps the other individual whose identification was found were excludable because of arrests on drug charges in Canada (Tr. at 16–17, 52–53). Border Patrol Agent John Crocitto testified that, after being contacted by the customs officers, he determined via radio that MacKenzie had been convicted on a narcotics charge in Canada, but that he did not know any details about the conviction (Tr. at 69–71, 82–83). Crocitto also testified that his reason for joining in the surveillance of MacKenzie was to enable him to speak with MacKenzie in order to verify MacKenzie's record (Tr. at 71).

Two customs vehicles and a border patrol vehicle followed the defendant to the vicinity of the Buffalo International Airport, where MacKenzie drove into the parking area of a Days Inn Motel and parked his car (Tr. at 18–19, 39–40). He left his ve-

hicle and, as he was walking toward the Days Inn entrance, was met by another man who had come out of the building. Mackenzie then returned to the car with the other individual. The other individual, later identified as defendant Head, was observed carrying an off-white canvas bag. The officers decided not to stop the men at this point (Tr. at 22, 40–41, 58, 75).

MacKenzie's car left the parking lot, went out into Genesee Street, and made a right turn away from the airport. The vehicle went a mile or two east on Genesee Street, made a right turn onto Transit Road and, after several miles, went into a Burger King parking lot. Inspector Knox testified that he wanted the car stopped after it left the Days Inn parking lot because he felt that "to carry this on might be a little ludicrous" (Tr. at 21).

After entering the parking lot, MacKenzie's car moved from one end of the lot to the other, and it was in the lot approximately two to two-and-one-half minutes before the officers decided to move in order to arrest MacKenzie and to determine whether Head also was excludable—in Knox's words, to "take them down" (Tr. at 22, 42, 62, 64–65, 78–79). Inspector Knox pulled his vehicle behind MacKenzie's, and the officers converged on MacKenzie's car. Just before getting out of his vehicle, Agent Crocitto observed MacKenzie "raise his right hand ... and rapidly and in a continuous movement [take an] object and shove[ ] it behind the passenger seat" (Tr. at 61).

After the defendants were out of the vehicle, Knox reached to the back seat to get a bag that he saw there, ostensibly to recover any weapons that might be in it (Tr. at 25). Knox said that as he took out the bag, which resembled the bag that Head had been carrying at the Days Inn, he "saw 2 packages of what looked to be white powder wrapped in clear plastic with some duct tape wrapped on it.... They were laying on the floor right underneath where the bag was before I picked up the bag.... This is ... behind the passenger's seat." (Tr. at 26–27). It was in these

packages that the agents found a quantity of cocaine.

## DISCUSSION

Relying on 19 U.S.C. §§ 1581 and 1582,[1] the government argues that the customs inspectors had authority to conduct the initial warrantless search of MacKenzie's car under the authority of *United States v. Gaviria*, 805 F.2d 1108 (2d Cir.1986), *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987). The government's theory is premised on the fact that the inspectors kept eye contact with the vehicle after it left the primary-inspection area. Because of this, the government argues that the inspectors maintained the right to stop the vehicle, to question MacKenzie, and to search both MacKenzie and the car. The government characterizes the search that occurred near the North Grand Island Bridge as a secondary search identical in nature to those normally conducted at the secondary-inspection station located at the Lewiston–Queenston Bridge. The defendants argue that after the vehicle passed through the primary-inspection post without being sent to the secondary-inspection area, customs officers did not have the right to stop it unless they had a reasonable suspicion of criminal activity.

As to the arrest of the defendants and the seizure of cocaine in the Burger King lot, the government, citing 8 U.S.C. § 1357,[2] argues that the border patrol agents were entitled to stop the car and to question MacKenzie because they had information indicating that he might be an excludable alien. In support of its position, the government also notes that the agents also knew that MacKenzie had told the customs officers that he was going to the airport or to the Days Inn to pick up his mother, but instead picked up another un-identified male, left the airport, and went to the Burger King. The defense asserts that in order to be excludable from the United States, MacKenzie would have had to have been convicted of a drug charge in Canada, and, even assuming the right of the border patrol agents to question him about his citizenship and his right to be in the United States, the agents lacked sufficient information to make an arrest, to search the vehicle, or to seize the bag and packages of cocaine without a warrant.

Without question, border searches by customs agents are permissible at ports of entry. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). When searches occur away from the border, however, different rules may apply. Generally, courts have considered three types of searches that occur away from the actual border: 1) "checkpoint" searches, 2) "functional-equivalent-of-the-border" searches, and 3) "extended-border" searches. *See United States v. Gaviria*, 805 F.2d at 1111–14; *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir.1988); *United States v. Carter*, 760 F.2d 1568, 1576 (11th Cir.1985); *United States v. Garcia*, 672 F.2d 1349, 1353–55 (11th Cir.1982); *United States v. Mayer*, 818 F.2d 725 (10th Cir.1987); *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir.1985); *United States*

---

**1.** 19 U.S.C. § 1581(a) provides:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti–Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance 19 U.S.C. § 1582 provides:

The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.

**2.** 8 U.S.C. § 1357(a)(1) provides:

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States....

v. Niver, 689 F.2d 520, 526 (5th Cir.1982); United States v. Richards, 638 F.2d 765 (5th Cir.), cert. denied, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).

The search at the North Grand Island Bridge clearly was not conducted at a customs checkpoint. Nor was it a functional-equivalent-of-the-border search, which usually occurs when an airport serves as the final destination for a non-stop flight having a foreign origination, as in United States v. Caminos, supra, or United States v. Gaviria, supra, and which must take place "after a border crossing at the first practicable detention point." United States v. Garcia, 672 F.2d at 1365. In Caminos, a package was sent to the United states on a flight that had originated in Brazil. The package was placed under a customs bond after arriving in New York and eventually was shipped to Pittsburgh,. where a customs officer discovered cocaine secreted in a wood carving that was inside the package. The court found that reasonable suspicion for the search was not required because the package was still under customs bond and the airport was considered to be the port of entry. In Gaviria, a shipment described as canned fruit was dispatched by airplane from Columbia to John F. Kennedy International Airport in Queens, New York. However, the plane landed first at Miami, where customs officials examined the contents of some of the cartons, noted that they had been inspected, and then sent them on to JFK by bonded truck carrier. Another inspection occurred there, and cocaine was found in several cans within two of the cartons. In both of these cases, the packages continued to be under the possession and control of customs agents. It is important also to note that the searches were made of packages under customs bonds and not of individuals or an automobile.

■ An extended-border search is one "that usually is conducted after a person or some property has 'cleared an initial customs checkpoint and [has] entered the United States.'" United States v. Gaviria, 805 F.2d at 1112 (quoting United States v. Glaziou, 402 F.2d 8, 13 (2d Cir.1968), cert.

denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969)). See also United States v. Garcia, 672 F.2d at 1360–1366 (court extensively reviews checkpoint searches, functional-equivalent searches, and extended-border searches in the Fifth Circuit). An extended-border search does not require a warrant, but due to the greater intrusion on legitimate expectations of privacy, it is permitted only if supported by reasonable suspicion. United States v. Garcia, 672 F.2d at 1364.

The aircraft searches described in cases like United States v. Garcia do not support the government's position. As the court explained in that case:

A search within the border may also be justified as a border search requiring no warrant nor any suspicion if there is reasonable certainty that the object or person searched has just crossed the border, there has been no time or opportunity for the object to have changed materially since the time of crossing, and the search is conducted at the earliest practicable point after the border was crossed. Justice Stewart's example of the search of an aircraft at its first point of landing in the United States after an international flight is the paradigm example of this type of search. Almeida–Sanchez v. United States, supra, 413 U.S. [266] at 272, 93 S.Ct. [2535] at 2539 [37 L.Ed.2d 596 (1973)]. This type of search is justified under the border-search doctrine because it is in essence no different than a search conducted at the border; the reason for allowing such a search to take place other than at the actual physical border is the practical impossibility of requiring the subject searched to stop at the physical border. The government's interest in controlling the flow of persons and objects across its borders is no less vital with respect to conveyances that cannot practically be detained at the physical border than with those that can. Id. at 1363–64.

As a practical matter, aircraft cannot be stopped at the border, and, therefore, a search at an airport may be considered in the same manner as a search at an official

port of entry such as the customs station at the Lewiston–Queenston Bridge. But, as the numerous cases referred to in *Garcia* make clear, when a vehicle has been given clearance at the border and has proceeded into the interior of the country, a customs officer must have information supplying reasonable suspicion before the vehicle may be stopped and searched.

■ It is clear that the search that occurred at the North Grand Island Bridge cannot properly be characterized as merely a secondary search. The secondary inspection station at the Lewiston–Queenston Bridge was the most practicable place to stop and to search the vehicle. Customs has a regular facility there to conduct interviews and searches of vehicles immediately after they enter the United States. That secondary-inspection area may not be expanded on the whim of an individual agent simply because he continues to make eye contact with a vehicle and later comes to his own conclusion that the vehicle should have been "secondaried." The officer at the primary inspection area who has the opportunity to have a face-to-face interview with the driver and occupants of a vehicle has the best opportunity to make that decision. In addition, at the primary-inspection area the officer has facilities to check for prior entries and for criminal records of the individuals who are attempting to enter the country.

Moreover, it is clear that the decision to search MacKenzie's car was based on observations made by Inspector Knox and his fellow customs officials after the vehicle had been cleared at the primary-inspection area for entry into the United States. Although Knox testified that he and his fellow officers felt that the vehicle should have undergone a secondary search at the Lewiston–Queenston Bridge, they came to that conclusion only after observing the movements of both MacKenzie and his car during the ensuing trip. Had the search been conducted soon after MacKenzie's car had been cleared through the primary-inspection point, the government's position would be much stronger. But that obviously is not what happened here. The customs officials followed MacKenzie for some eleven or twelve miles before conducting the extensive search described by Inspector Knox. Unless the government is suggesting that a secondary inspection can be delayed virtually indefinitely, the authority of customs officials to conduct such a search clearly must end at some point. Whatever that point may be in a given case, it clearly was passed here. Plainly and simply, this was not a secondary search. Rather, it is apparent that the customs officers stopped MacKenzie's car because what they perceived as furtive and nervous behavior led them to suspect that MacKenzie was engaged in criminal activity.

■ That suspicion, however, was not reasonable. The actions and movements described by Knox of MacKenzie and his car while proceeding on the thruway were similar to those of many other drivers and vehicles. On a divided four-lane highway, it is not unusual to see vehicles travelling at high rates of speed or passing other vehicles, or drivers twitching in their seats or tapping their seats with their fingers while driving. While customs agents are entitled to stop a vehicle after it has left its place of entry if the circumstances give rise to a reasonable suspicion of criminal activity, none of these activities and movements described by Inspector Knox provided such a suspicion. Furthermore, under these circumstances, learning that the vehicle had a Nova Scotia registration in the name of someone named MacKenzie did not justify stopping the vehicle and searching it in the extensive manner described by Agent Knox. That warrantless search, therefore, violated MacKenzie's fourth amendment right to be free from unreasonable searches and seizures.

■ As already noted, the customs inspectors did not consider the matter closed after the roadside search, and they contacted the border patrol for assistance in continuing the surveillance of MacKenzie's car. Although Border Patrol Agent Crocitto testified that he, unlike the customs officers, had obtained information indicating that MacKenzie was excludable because his criminal record included a convic-

tion,[3] he initially learned that MacKenzie had a record of some kind from the customs inspectors who, in turn, had obtained the information as a result of the illegal detention and search at the North Grand Island Bridge. That information, therefore, was the tainted fruit of the customs officials' unconstitutional conduct. Consequently, since they would not have learned that MacKenzie had been convicted but for the illegal actions of the customs inspectors, the border patrol agents could not rely on MacKenzie's conviction record to justify placing him in custody and searching his car at the Burger King parking lot. The fruits of that search—the cocaine—must, therefore, be suppressed.

 To be sure, border patrol agents have broad discretion to stop and to question individuals they know to be aliens if there is enough suspicious activity to warrant questioning. *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir.1984); *United States v. Bews*, 715 F.Supp. 1206 (W.D.N.Y.1989). But even assuming *arguendo* that the border patrol agents were entitled to question MacKenzie about his right to be in the United States despite the unconstitutional conduct of the customs inspectors, the intrusion they were permitted to make was only a brief detention—not a full-blown search or an arrest. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

The observations made by the officials at the Days Inn Motel and en route to the Burger King restaurant also did not furnish a reasonable belief that the defendants were engaged in criminal activity. Although MacKenzie told the agents that he was going to pick up his mother, there are many plausible explanations as to why a traveler under these circumstances might not go directly to the airport and might instead drive to the Days Inn and then to the Burger King. Finally, the mere passing of an object to the rear seat of a vehicle is hardly unusual and, whether considered alone or with all of the circumstances present, did not authorize the agents to arrest MacKenzie and Head or to search the vehicle. Furthermore, the plastic container was not in plain view when the officer reached into the vehicle. There simply was no probable cause to arrest, and the search of the vehicle without a warrant was impermissible.

In all respects, the defendants' motions to suppress are thus granted. The court shall meet with the parties on March 27, 1990, at 2:30 p.m.

So ordered.

---

**3.** 8 U.S.C. § 1182(a)(23)(A) provides:
   (a) General classes
      Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
         (23) Any alien who—
         (A) has been *convicted* of a violation of, or a conspiracy to violate, any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))....
(Emphasis added.) The customs inspectors were thus incorrect in assuming that either MacKenzie or his passenger could have been excluded simply for having been arrested previously.