

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-1999

# USA v. Stewart

Precedential or Non-Precedential:

Docket 98-1260

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Stewart" (1999). *1999 Decisions.* Paper 202.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/202

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 16, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1260, 98-1302, 98-1541,
98-1716, 98-1860, and 98-1968

UNITED STATES OF AMERICA

v.

ALLEN W. STEWART,

  Appellant in No. 98-1260

UNITED STATES OF AMERICA

v.

ALLEN W. STEWART,

  Appellant in No. 98-1302

UNITED STATES OF AMERICA

v.

ALLEN W. STEWART,

  Appellant in No. 98-1541

UNITED STATES OF AMERICA

v.

ALLEN W. STEWART,

  Appellant in No. 98-1716

UNITED STATES OF AMERICA

      Appellant in 98-1860

v.

ALLEN W. STEWART,

UNITED STATES OF AMERICA

v.

ALLEN W. STEWART,

      Appellant in No. 98-1968

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 96-00583-1)
District Judge: Honorable Harvey Bartle, III

Argued May 27, 1999

BEFORE: GREENBERG and ALITO, Circuit Judges,
and DOWD,* District Judge

(Filed: July 16, 1999)

W. Neil Eggleston (argued)
Richard A. Ripley
Timothy K. Armstrong
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

_____

*Honorable David D. Dowd, Jr., Senior Judge of the United States
District Court for the Northern District of Ohio, sitting by designation.

Kenneth I. Trujillo
Ira Neil Richards
Trujillo Rodriguez & Richards, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA 19103

 Attorneys for Appellant-Cross-
 Appellee Allen W. Stewart

Michael R. Stiles
United States Attorney
Walter S. Batty, Jr.
Assistant United States Attorney
Chief of Appeals
Linda Dale Hoffa (argued)
Assistant United States Attorney
Michael V. Rasmussen (argued)
Special Assistant United States
 Attorney
Suite 1250
615 Chestnut Street
Philadelphia, PA 19106-4476

 Attorneys for Appellee-Cross-
 Appellant United States of America

Ross S. Myers
National Association of Insurance
 Commissioners
120 W. 12th Street, Suite 1100
Kansas City, MO 64105

 Attorney for Amicus Curiae
 National Association of Insurance
 Commissioners

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

On December 17, 1997, a district court jury convicted
Allen W. Stewart, formerly a partner in a Philadelphia law

firm, of 135 counts of mail fraud, 18 U.S.C. S 1341, wire fraud, 18 U.S.C. S 1343, money laundering, 18 U.S.C. S 1957, and racketeering, 18 U.S.C. S 1962(c). On August 12, 1998, the court sentenced Stewart to 180 months in prison, to be followed by three years of supervised release and required him to forfeit substantially all of his known assets and to pay $60 million in restitution.

Stewart appeals from the judgment of conviction and sentence, raising many legal issues as to why he is entitled to a new trial or an acquittal. Stewart also challenges the district court's forfeiture of his personal Merrill Lynch account ("the Account") as substitute assets under 18 U.S.C. S 982(b)(1). The government cross-appeals the district court's ruling that the Account was not directly forfeitable under 18 U.S.C. S 982(a)(1) as property "involved in" or "traceable to" Stewart's money laundering activities. For the reasons that follow, we will affirm Stewart's conviction and sentence and the other orders from which he appeals. We, however, will reverse on the government's cross-appeal and thus will modify the district court's forfeiture order so that the Account is forfeited directly rather than as a substitute asset. As modified, we will affirm the forfeiture order.

II. BACKGROUND

A. Factual History

This case involves a very complicated series of fraudulent transactions that we only summarize. Stewart's activities revolved around various insurance companies and shell corporations he created to facilitate his fraudulent transactions. Stewart's two main vehicles for his criminal activities were Summit National Life Insurance Company ("Summit"), formerly an Ohio corporation that moved to Pennsylvania, and Equitable Benefit Life Insurance Company ("EBL"), a Pennsylvania corporation. In 1994, the Pennsylvania Department of Insurance ("Department") took control of these companies because they were insolvent. Stewart had sold these companies for a nominal amount immediately before their insolvency was revealed. During his ownership, each company reported that its assets

4

exceeded its liabilities. These surpluses were fraudulent, however, as the companies inflated their assets with unsecured worthless IOUs and accounting acrobatics aimed at concealing the huge deficits that Stewart created by his leveraged purchase of Summit and by his other conduct.

The fraudulent transactions began in 1988 when Stewart, who already owned EBL through a holding company, bought Summit. Stewart originally became involved in the Summit purchase as Richard Fanslow's attorney in Fanslow's attempt to acquire Summit. To facilitate the acquisition of Summit, Fanslow created a shell corporation to buy Summit for $52 million, subject to post-closing adjustments. When Fanslow's bid failed because of the disapproval of Ohio's insurance regulators, Stewart stepped in as the purchaser. When Stewart took over, he needed approximately $62 million to buy out Fanslow and purchase Summit.

In preparing to purchase Summit, Stewart formed a Pennsylvania partnership called Summit Company in which he assigned the interests as follows: 9% to himself, 9% to his wife, 34% to a stepson, 24% to a trust he had created for another stepson, and 24% to a trust he had created for his son. Despite his 9% ownership, Stewart exercised actual control over the partnership. According to the purchase agreement between Stewart and Fanslow, Stewart was to pay Fanslow $473,499 in cash, deliver a $6.4 million promissory note to him and pay a large portion of Fanslow's deposit to acquire Summit. On October 6, 1988, Stewart acquired Summit with a $47.7 million bank loan and a $2.7 million contribution from EBL.

Stewart then needed approximately $62 million to pay the bank, Fanslow, and other expenses, as well as to secure the promissory note. Summit's $31 million capital and surplus could not cover this amount, so Stewart devised a number of schemes to pay off his debts without showing a reduction in Summit's assets.

First, Summit sent more than $70 million to EBL. In turn, EBL passed $62 million through a handful of Stewart's shell corporations, which eventually paid the bank loan and Fanslow. In return for the $62 million, these

5

shell corporations generated a series of unsecured IOUs to EBL and Summit.

Stewart made these transfers pursuant to a reinsurance agreement between EBL and Summit. In exchange for the $70 million it received from Summit, EBL agreed to pay future claims on a portion of Summit's policies. Summit, in turn, recorded a reduction in liabilities corresponding to its reduction in assets when it gave EBL the $70 million. EBL recorded a corresponding increase in assets and liabilities. However, Summit continued to make the payments on claims for which EBL supposedly assumed responsibility. Stewart continued hiding Summit's missing assets by double-pledging the collateral used to secure the Fanslow promissory note and through further fraudulent transactions whereby Stewart would circulate money taken from Summit through his other corporations before returning it to Summit as payments on the IOUs. Summit also engaged in a sham reinsurance agreement with an unrelated insurance company, similar to the fraudulent agreement it had entered into with EBL, and purchased another insurance company in 1992, to which it assigned all of EBL's profitable business.

Stewart did not inform the Ohio insurance regulators of his acquisition of Summit. When they learned of it, the regulators disapproved and ordered the transaction unwound. Stewart then sued the Ohio Commissioner of Insurance following which the parties reached a settlement in which Summit agreed to sell its Ohio policies to another insurer and move out of Ohio.

In addition to his fraudulent efforts to conceal the deficits in his insurance companies, Stewart also began stealing funds from Summit for his personal use. Pursuant to its agreement with the Ohio regulators, Summit sold 25% of its policies to an unrelated insurance company, Continental Western, and its parent, Beneficial Life Insurance Company ("Beneficial"), in exchange for an annual return of 90% of the profits from these policies. In January 1992, Stewart caused Summit to assign, without compensation, this agreement to another shell corporation he controlled. He used the payments from Beneficial to help purchase a $1.6 million ocean-front house in Del Mar, California, to pay for

6

improvements to the house and furnish it with antiques, to pay a $100,000 annual salary to his girlfriend, and to pay $20,000 in "professional fees" to his son. It also appears that Stewart "borrowed" $2 million from Summit through a similar scheme to pay for renovations to his wife's house in Radnor, Pennsylvania.

Stewart ultimately concluded that he should sell Summit and EBL before anyone would have the opportunity to detect his fraudulent activities. In September 1992, he convinced Larry Fondren, an interested buyer, to sign a letter of intent to purchase the companies for approximately $8 million. When Fondren tried to examine their books his due diligence was obstructed, and thus he attempted to withdraw from the purchase. Stewart then sought another buyer but that buyer's accountant discovered that Summit and EBL were insolvent. Meanwhile, Stewart had brought suit against Fondren and thereby forced Fondren to go through with the purchase on the condition that he would not make a substantial payment for the companies.

After he took over the companies, Fondren's fears were realized when he discovered that both were insolvent. He contacted the Department, which placed the companies into rehabilitation in 1994. The Department traced the companies' insolvency to Stewart's ownership period.

As a result of the companies' insolvencies, over 9,000 life insurance policies were devalued, other policies became worthless, and other insurance companies that belonged to the same Guarantee Association were forced to take over certain liabilities of Summit and EBL. The government established at sentencing that the losses from the companies' insolvencies exceeded $80 million, and that Stewart was personally responsible for $60.1 million of this amount.

Through Stewart's criminal activities, he accumulated -- aside from amounts not relevant to this discussion-- $3 million which he deposited into his Account at Merrill Lynch on or about August 30, 1996. The Account previously contained $160,000, which was, as far as the government could ascertain, legitimate money not related to Stewart's criminal activity. The government obtained a

7

pretrial restraint against the withdrawal of the entire Account. Thereafter, the only withdrawal from the Account was $600,000, released pursuant to a July 3, 1997 agreement between the government and Stewart so that he could retain trial attorneys of his choice. At the time of the withdrawal, Stewart and the government agreed that the $600,000 included the legitimate $160,000. Ultimately, the court ordered this Account forfeited as a substitute asset.

B. Procedural History

When Stewart's scheme collapsed, a grand jury indicted him. During the ensuing jury trial, the government sought to forfeit directly Stewart's personal Account at Merrill Lynch under the RICO forfeiture statute, 18 U.S.C.S 1963. In its special forfeiture verdict, however, the jury declined to forfeit the Account as property acquired or maintained as a result of Stewart's RICO violations. Following the trial the government nevertheless claimed that the Account should be forfeited as a substitute asset under 18 U.S.C. S 982(b)(1), a provision in the criminal money laundering forfeiture statute.1 The government later changed its position and requested that the funds in the Account be forfeited directly under 18 U.S.C. S 982(a)(1) as property "involved in" or "traceable to" Stewart's money laundering offenses.

The district court at Stewart's sentencing hearing on August 12, 1998, considered the government's request to forfeit the Account directly. During the hearing, the government traced $3 million of laundered funds to the Account. These funds represented the same money that, according to the jury's verdict on Count 153 of the indictment, Stewart had withdrawn illegally from the Merrill Lynch account of Tartan Management Corporation, a company Stewart controlled. The jury specifically forfeited this $3 million in Count 157 under 18 U.S.C. S 982, the money laundering forfeiture provision. Despite the government's success in tracing the funds to the Account, the district court concluded that United States v. Voigt, 89

_____

1. The substitute asset provision in 21 U.S.C.S 853 is incorporated into 18 U.S.C. S 982(b)(1). See id. (incorporating subsection (p) of 21 U.S.C. S 853).

8

F.3d 1050 (3d Cir. 1996), precluded the direct forfeiture of the $3 million because the money had been commingled with the $160,000 of untainted funds already in the Account.

In an October 6, 1998 order, the court then considered the government's alternate request to forfeit the Account as a substitute asset. The court concluded that the government had satisfied the money laundering substitute asset provision because it demonstrated that qualified property, the $3 million Stewart withdrew from the Tartan Management account, had been "commingled with other property which cannot be divided without difficulty." 18 U.S.C. S 982(b)(1) (incorporating 21 U.S.C.S 853(p)(5)). It therefore granted the government's motion.

## III. DISCUSSION

Turning to the merits of this appeal, we first discuss Stewart's challenges to his conviction and then consider the challenges to the district court's October 6, 1998 forfeiture order.[2] With respect to the purported trial errors, we address only those issues Stewart raised at oral argument, as we find the myriad other contentions contained in Stewart's brief to be clearly without merit.[3]

---

2. The district court had jurisdiction under 18 U.S.C. S 3231 and we have jurisdiction under 28 U.S.C. S 1291 to review the district court's judgment of conviction and its October 1998 forfeiture order as well as the other orders on appeal.

3. Accordingly, we reject without discussion Stewart's arguments that the district court violated his right of confrontation by prohibiting recross-examination, the RICO count as set forth in the indictment was defective on its face, the district court constructively amended the indictment's charges on RICO enterprise, the evidence was insufficient to establish that Stewart mailed the fraudulent communications for his mail fraud convictions, the evidence was insufficient to establish a scheme to defraud, the indictment failed to charge an essential element of the offense of money laundering by not mentioning a "financial institution," the district court constructively amended the indictment by broadening the potential basis of conviction for the money laundering counts, there was insufficient evidence to establish venue in the Eastern District of Pennsylvania, there was insufficient evidence to establish that the fraudulent transactions affected interstate commerce, and the McCarran-Ferguson Act, 15 U.S.C. SS 1011-1015, barred the prosecution.

9

A. Did the district court violate Stewart's right to the
      counsel of his choice by disqualifying his "expert"
      attorneys?

Stewart first argues that the district court's
disqualification of certain of his attorneys deprived him of
his Sixth Amendment right to counsel. After conducting a
hearing, the district court, on September 24, 1997, granted
the government's motion to disqualify the law firm of
Christie, Pabarue, Mortensen and Young ("Christie
Pabarue") from representing Stewart in the criminal
prosecution. See United States v. Stewart, No. 96-583, 1997
WL 611594, at *4 (E.D. Pa. Sept. 24, 1997). However,
Robert E. Welsh, Jr., who was not from that firm, had
represented Stewart since the middle of 1996, months
before the grand jury indicted him on December 4, 1996,
and the court did not disqualify Welsh. Although Christie
Pabarue had been working "informally" with Welsh during
the same period, the firm had not entered its appearance as
co-counsel until July 31, 1997. Id. at *1.

The conflict leading to Christie Pabarue's disqualification
arose because the firm also had been representing Stewart,
Jeanne Fletcher, June O'Brien, Geoffrey Stewart, and Paul
Tamaccio in a civil RICO action in the district court brought
by the Pennsylvania Insurance Commissioner parallel to
this case. Fletcher, O'Brien, Geoffrey Stewart, and Tamaccio
had agreed with the government to testify for it at Stewart's
criminal trial. These four persons had various relationships
with Stewart that we describe below. On April 10, 1997, the
district court in the civil action denied the Commissioner's
motion to disqualify Christie Pabarue from representing 14
co-defendants, including Stewart and these four
individuals. See Kaiser v. Stewart, 1997 WL 186329, at *5
(E.D. Pa Apr. 10, 1997). However, the firm's representation
of Stewart in the criminal trial was more problematic to the
district court. See United States v. Stewart, 1997 WL
611594, at *1.

The court recognized that the government had granted
immunity to Fletcher, O'Brien, Geoffrey Stewart, and
Tamaccio, and characterized their testimony as "significant"
to the prosecution. Id. At the hearing on the government's
disqualification motion in this case, Stewart and the four

10

witnesses each stated that he or she waived any conflicts, agreed to the disclosure of privileged information, and consented to allowing Christie Pabarue to serve as Stewart's attorney. Id. Yet, the district court determined that the firm's defending of Stewart was "directly adverse" to its representation of the four individuals, and thus placed the Christie Pabarue attorneys in the "unenviable position of cross-examining their own clients with the help of attorney-client communications." Id. at *3.

Moreover, the court doubted that the four individuals comprehended the ramifications of adverse representation and questioned whether their waivers were truly voluntary inasmuch as each of the four was tied intimately to Stewart: Fletcher was still an officer of an operating insurance company Stewart owned and controlled; O'Brien was Stewart's live-in girlfriend; Geoffrey Stewart was his son; and Tamaccio was his step-son. Id. at *3-*4. Furthermore, Stewart was paying both O'Brien's civil and criminal legal fees, and his company was paying Fletcher's fees. Id. at *4. The court also recognized that it had an "independent responsibility to uphold the ethical precepts of the legal profession as well as the public interest in the integrity of the judicial process." Id. Finally, the court stated that Welsh was "able and experienced" and that "[n]o evidence or contention has been presented that [Christie Pabarue's] absence [would] prejudice Allen Stewart's right to a fair trial." Id.

We review the district court's order in two stages. First, we exercise plenary review to determine whether the district court's disqualification was arbitrary -- "the product of a failure to balance proper considerations of judicial administration against the right to counsel." Voigt, 89 F.3d at 1074. If we find that the district court's decision was not arbitrary, we then determine whether the court abused its discretion in disqualifying the attorneys. See id.

Stewart seems to attack the district court's disqualification decision as arbitrary, although he may be confusing the two aspects of our dual prong analysis. Stewart equates an adverse decision with an arbitrary one, and puts much stock in the fact that the court allowed Christie Pabarue to represent all of the defendants,

11

including Stewart and the four individuals, in the civil RICO case. We long have recognized, however, that"[a]s long as the court makes a `reasoned determination on the basis of a fully prepared record,' its decision will not be deemed arbitrary." Id. at 1075 (quoting Fuller v. Diesslin, 868 F.2d 604, 609 n.4 (3d Cir. 1989)). In this case, the court held a hearing and properly balanced the factors for and against disqualifying Christie Pabarue. Thus, we cannot say that its decision was arbitrary, as we have defined that term in the context here, and we confine our review to determining whether the district court abused its discretion in making this decision.

Considering Stewart's arguments in light of our deferential standard of review, we find that the district court did not abuse its discretion in disqualifying Christie Pabarue. Indeed, even if we were to review the court's decision de novo, we still would uphold its determination, as we have come to the same conclusion as did the district court regarding the propriety of Christie Pabarue's representation of Stewart at the criminal trial.

Stewart claims that the district court erred because only a few months earlier in the civil RICO case it denied a "substantively indistinguishable motion." Br. at 24. However, Stewart mischaracterizes the situation, for while the motions sought similar relief, the circumstances surrounding their consideration were quite different. When the district court declined to disqualify Christie Pabarue in the civil RICO case, the firm was representing all the defendants in that suit but did not claim that it represented Stewart in the criminal action. See Kaiser v. Stewart, 1997 WL 186329, at *1 n.1 ("Stewart has separate counsel in the criminal action."). Here, however, Stewart was the defendant in a criminal prosecution, and his civil co–defendants, figuratively at least, were sitting on the other side of the courtroom because they had agreed to testify against him under grants of immunity. Thus, Christie Pabarue's multiple representations in the civil RICO case created a conflict of interest with its representation of Stewart in his criminal trial.

In disqualifying Christie Pabarue in the criminal case, the district court recognized that the firm "informally" had been

12

working with Welsh on Stewart's defense since "mid-1996." United States v. Stewart, 1997 WL 611594, at *1. Yet it is questionable that the district court in the civil RICO matter was aware of this fact when it denied the Commissioner's disqualification motion. Moreover, we believe that if it had known of the firm's "informal" representation of Stewart in the criminal case, the court might have viewed its representation of him in the civil case as much more problematic.

We recognize but reject Stewart's argument that there was no "direct conflict of any kind" because the four individuals were not criminal defendants. Br. at 26 (emphasis in original). While it is true that the typical scenario where disqualification becomes necessary entails an attorney's attempt to represent multiple defendants in the same prosecution, we have recognized that conflicts arise where a "defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of his choice may have divided loyalties due to concurrent or prior representation of another client who is a co-defendant, a co-conspirator, or a government witness." United States v. Moscony, 927 F.2d 742, 749 (3d Cir. 1991) (emphasis added).

Because the Christie Pabarue attorneys would have been part of a team of attorneys required to cross-examine the four individuals testifying for the government, Stewart's right to effective counsel could have been compromised by the divided loyalties of his own attorney: "Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties." Id. at 750 (citations omitted). Thus, Stewart is mistaken in arguing that Christie Pabarue's multiple representations did not pose a serious potential for conflicts of interest simply because the four individuals were not co-defendants in the criminal trial.

Similarly, we reject Stewart's contention that the district court's "theory as to why Mr. Stewart's interests diverged from the four witnesses' interests collapses under scrutiny." Br. at 27. The district court stated that it could be an "obvious" defense theory at trial to focus blame for

13

wrongdoing on the four individuals. United States v. Stewart, 1997 WL 611594, at *3. Stewart claims that such a theory was "directly contrary to the publicly declared strategy of defense that counsel had already adopted." Br. at 27 (emphasis in original). The defense's "publicly declared strategy" was to assert that the allegedly fraudulent transactions were legal because Stewart had received the approval from the proper regulatory agencies for them. Id.

We recognize that, as the Supreme Court noted in Wheat v. United States, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700 (1988), there is a presumption in favor of a defendant's choice of attorneys. But the Supreme Court went on to explain that:

> that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

Id., 108 S.Ct. at 1700 (emphasis added).

Moreover, notwithstanding an attorney's pretrial assurances otherwise, a defendant's trial strategy is not fixed. Thus, if an attorney has been unsuccessful in bringing out the necessary points in support of a contemplated defense, the attorney may change his strategy to provide the defendant with the best possible defense. Accordingly, the district court could not accept Stewart's assurances that he would not pursue an alternate strategy at trial. In fact, by so doing, the court would have been opening the door for a manufactured mistrial or a possible ineffective assistance of counsel claim on appeal. We emphasize that this was a complex trial and that during the course of a case of this nature a defendant well might change his strategy. In this regard, we point out that a district court will not limit a defendant at trial to the position the defendant stated in pretrial public statements, which a court will not regard as a defensive bill of particulars.

14

Furthermore, we find equally unavailing Stewart's argument that the district court abused its discretion in disqualifying Christie Pabarue in the face of his and the other four individuals' waiver of any conflicts. Stewart's argument does not take into account the court's obligation to examine the validity of a waiver. After all, we have held that "[s]uch a waiver, . . . does not necessarily resolve the matter, for the trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver." Moscony, 927 F.2d at 749. The tension between protecting the institutional legitimacy of judicial proceedings, which includes a concern to shield a defendant from having his defense compromised by an attorney with divided loyalties, and allowing a defendant to be represented by the attorney of his choice, creates the disqualification issue. Thus, a district court has discretion to disqualify counsel if a potential conflict exists, see Wheat, 486 U.S. at 164, 108 S.Ct. at 1700, even where the represented parties have waived the conflict.

Moreover, we agree with the district court's conclusion that the four individuals did not "fully comprehend[ ] the ramifications flowing from joint representation" and we share the court's doubt that the waivers were "truly voluntary." United States v. Stewart, 1997 WL 611594, at *3-*4. As the district court noted, even with its vast experience in presiding over criminal trials, it cannot foresee what ramifications can flow from multiple representations. Thus, the court had good reason to doubt "that anyone could be sufficiently prescient to foresee the exact path this case [would] take either in the time remaining before trial or at trial." Id. at *3. Further, the four individuals had personal relationships with Stewart and could have felt that by waiving the conflicts and their privileges they somehow were lessening the damage that their adverse testimony would cause to Stewart. When we also consider that Stewart either personally or through his insurance company was paying the legal fees of two of these individuals, we see no reason to upset the district court's judgment on this matter.

15

Finally, we reject Stewart's claim that the government manufactured the conflict to disadvantage him at trial. Br. at 28-29. Such a claim flies in the face of reality inasmuch as the government agreed to immunity for all four individuals and thus to that extent lessened the conflict. In any event, the conflict was real. Accordingly, we will affirm the district court's order disqualifying Christie Pabarue from representing Stewart in this case.

B. Did the indictment omit an element of "mail fraud"?

Stewart argues that we must reverse the mail fraud convictions -- and consequently the money laundering and RICO convictions that relied upon the mail fraud counts as predicate acts -- because the indictment and jury instructions omitted the "knowing" element of causing a fraudulent communication to be mailed. Br. at 49. 4 He claims that a violation of 18 U.S.C. S 1341 requires a showing that the defendant "mails or knowingly causes to be mailed an article in furtherance of a scheme to defraud." Id. According to this argument, the indictment's language drops this knowing element. The indictment states:

> 54. On or about each of the dates listed below, in the Eastern District of Pennsylvania and elsewhere, the defendant,
>
> ALLEN W. STEWART
>
> for the purpose of executing the scheme and artifice described above and attempting to do so, caused to be placed in an authorized depository for mail matter  the documents described below to be sent by the United States Postal Service, any one of which placements constitutes the commission of Act One. . . .

Joint app. at 1240-41 (emphasis added).

The mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or

_____

4. Because this argument raises a legal question of the elements of a criminal offense, we exercise plenary review. See United States v. Mosley, 126 F.3d 200, 201 (3d Cir. 1997), cert. dismissed, 119 S.Ct. 484 (1998).

> property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined . . . or imprisoned not more than five years, or both.

18 U.S.C. S 1341 (emphasis added).

We hold that inasmuch as 18 U.S.C. S 1341 does not require the "knowing" placing of a communication in an authorized depository for mail matter, the indictment correctly charged Stewart with causing communications to be placed in an authorized depository for mail matter. Use of the term "caused to be placed" in the indictment referred to the fact that a defendant can be held responsible for actions that he orders or directs another to perform. See 18 U.S.C. S 2(b). The jury was instructed on this theory of criminal responsibility. Joint app. at 3018-19. Conversely, Congress added the reference to "knowingly causes to be delivered" in section 1341 to ensure that a defendant would not be held responsible for fraudulent mailings where he unknowingly processes a piece of mail or otherwise is involved unwittingly with fostering the material's delivery. Because of this distinction, we hold that the indictment properly charged Stewart with mail fraud.

C. Was Stewart entitled to an "entrapment by estoppel" instruction?

Stewart argues that the district court erred in refusing to charge the jury on his defense theory of "entrapment by estoppel" -- that he had made the allegedly illegal transactions in reliance on the "categorical approval of all necessary state regulatory bodies after full investigation and disclosure." Br. at 56-57. Stewart argues that under Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 887 (1988), and United States v. Mosley, 126 F.3d 200, 203

17

(3d Cir. 1997), cert. dismissed, 119 S.Ct. 484 (1998), the district court's refusal to charge the jury on a recognized defense, for which there exists evidence for a reasonable jury to find in the defendant's favor, was reversible error.

We review the district court's refusal to instruct the jury on a defense theory de novo in light of the fact that Stewart objected to the court's refusal to give the charge. See Government of the Virgin Islands v. Joseph, 765 F.2d 394, 398 (3d Cir. 1985). The entrapment by estoppel defense applies where the defendant has established by a preponderance of the evidence that:

> (1) a government official (2) told the defendant that certain criminal conduct was legal, (3) the defendant actually relied on the government official's statements, (4) and the defendant's reliance was in good faith and reasonable in light of the identity of the government official, the point of law represented, and the substance of the official's statement.

United States v. West Indies Transp., Inc., 127 F.3d 299, 313 (3d Cir. 1997).

Stewart argues that he was entitled to have the district court instruct the jury on the defense based upon his interactions with the Ohio insurance regulators in purchasing Summit. The Ohio regulators initially had ordered the transaction unwound, but allowed the transaction to go through after being sued by Stewart. Pursuant to a Settlement Agreement, Ohio allowed the sale on the condition that Stewart move Summit out of Ohio and sell all of its Ohio policies to other Ohio insurance companies. Stewart argues that this Settlement Agreement

> represented (1) the statement of a government official (the Ohio Superintendent of Insurance), (2) to defendant that certain conduct (the purchase of SNLIC–Ohio as proposed, together with the cession of the Ohio Business and relocation to Pennsylvania by merger with Parkway) was lawful, and (3) the defendant relied on the Settlement Agreement, (4) with such reliance being in good faith and reasonable in light of the Superintendent's authority, the points of law at issue,

18

> and the substance of the statements in the Settlement Agreement.

Br. at 59.

We find that the evidence cannot establish an entrapment by estoppel defense and thus the court properly refused to charge on the defense. The Ohio Superintendent never stated to Stewart that the criminal conduct for which the jury later convicted him was legal. While Ohio ultimately consented to Stewart's purchase of Summit, it did not, and could not, approve of his concealment of Summit's and EBL's huge deficits, and his stealing funds from both companies. Accordingly, there is simply no reasonable way that the record can be read to support a conclusion that the Ohio regulators' highly conditional consent to Stewart's acquisition of Summit amounted to a statement that Stewart's conduct constituting mail fraud, wire fraud, money laundering, and RICO violations was legal.

Furthermore, the Ohio regulators did not even make a clear statement approving of Stewart's acquisition of Summit. Rather, the Settlement Agreement provides that "[n]othing contained herein shall constitute or be construed as an admission by any party hereto of the truth or validity of any of the claims or contentions asserted by either party in any of the Administrative Proceedings or the Court Proceedings, or the ratification of any past conduct by either party." Joint app. at 463. Thus, the parties expressly agreed that neither could construe the agreement as ratifying any past conduct. The agreement also demonstrates that Ohio's regulators, although stopping short of affirmatively accusing Stewart of illegal activity, did not want him conducting business in Ohio. As conditions of the Settlement Agreement, Ohio forced Summit to sell all of its Ohio policies, move to a different state, and surrender its authority to do business in Ohio. See id. at 457–58. No reasonable person can construe an agreement in which the regulators essentially ushered Stewart out of Ohio as approving of Stewart's conduct. Accordingly, for this reason as well, we hold that the Ohio regulators' statements cannot reasonably support a conclusion that the regulators condoned Stewart's illegal activities.

19

At bottom, Stewart's case is more like West Indies, 127 F.3d 299, than United States v. Pennsylvania Industrial Chemical Corp., 461 F.2d 468 (3d Cir. 1972), modified and remanded, 411 U.S. 655, 93 S.Ct. 1804 (1973), the only case in which we have found that the evidence supported an entrapment by estoppel defense. In Pennsylvania Industrial we reversed the defendant's conviction for discharging pollution in violation of the Rivers and Harbors Act, 33 U.S.C. S 407, because the district court refused to charge the jury on the entrapment by estoppel defense or to allow the defendant to present evidence that Army regulations and the government's long-term interpretation of the statute authorized its allegedly criminal acts. 461 F.2d at 479.

In West Indies, however, we affirmed the defendants' convictions despite the district court's refusal to instruct the jury on the entrapment by estoppel defense. 127 F.3d at 313-14. In that case, the defendants argued that their convictions for visa fraud could not stand over an estoppel defense because they had informed the INS fully of their conduct of which it then approved. Id. at 313. The defendants also argued that estoppel principles barred their convictions for illegal dumping inasmuch as the Coast Guard placed a placard stating that some types of "nonplastic trash" may be discharged at sea if the vessel is at least 12 nautical miles from shore. Id. at 314. We rejected both of these arguments on the grounds that the government never approved of the specific criminal activity. The INS was not apprised of the entire situation when granting the visas in question, while the Coast Guard's placard did not claim to set out all of the dumping restrictions. Id. at 313-14.

The circumstances here are similar. The Ohio regulators did not approve of Stewart's criminal conduct described in the counts on which the jury convicted him. Thus, we hold that the district court did not err in refusing to instruct the jury on the entrapment by estoppel defense because Stewart did not present sufficient evidence to permit a jury to conclude that he established the defense by a preponderance of the evidence. See, e.g., United States v. Weitzenhoff, 35 F.3d 1275, 1290-91 (9th Cir. 1993) (refusal

to instruct jury on entrapment by estoppel defense upheld); United States v. Billue, 994 F.2d 1562, 1568-69 (11th Cir. 1993) (same); United States v. LaChapelle, 969 F.2d 632, 637-38 (8th Cir. 1992) (same); United States v. Hurst, 951 F.2d 1490, 1499 (6th Cir. 1991) (same).[5]

## D. Did the district court err in giving a "willful blindness" instruction?

Stewart contends that although the district court instructed the jury that it could convict him on the mail and wire fraud counts based on "willful blindness," the government proceeded at trial on an actual-knowledge theory. He argues that this charge constituted reversible error because it lowered the government's burden of proving intent. He also argues that the court's instruction was flawed "as a matter of law" because the court omitted the "high probability requirement" that United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985), required. Because Stewart objected to this instruction at trial, we review the instruction de novo. See Joseph, 765 F.2d at 398.

We have upheld a district court's willful blindness instruction where the charge made "clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." Caminos, 770 F.2d at 365. In other words, a willful blindness charge does not lower the government's burden of proving intent as long as it "emphasize[s] the necessity of proving a subjective awareness." Id. at 366. If the charge satisfies this standard, and is supported by sufficient evidence, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory. See United States v. Stuart, 22 F.3d 76, 81 (3d Cir.

_____

5. Although we do not reach the issue, we are doubtful that a defendant can claim an entrapment by estoppel defense when, as Stewart contends was the case here, the government official is a state official who approves
of the criminal conduct on state law grounds and the defendant is accused of violating federal law. See Hurst, 951 F.2d at 1499-50; United States v. Etheridge, 932 F.2d 318, 320-21 (4th Cir. 1991); United States v. Bruscantini, 761 F.2d 640, 641-42 (11th Cir. 1985).

21

1994). Moreover, contrary to Stewart's second assertion, we do not require a court's charge to contain specific language that a defendant must have "a subjective awareness of a high probability that something is amiss." See id. at 81 (upholding the following instruction: "The government may prove that a person acted knowingly by proving beyond a reasonable doubt that that person deliberately closed his eyes to what otherwise would have been obvious to him. One cannot avoid responsibility for an offense by deliberately ignoring what is obvious.").

Momentarily putting aside the issue of the sufficiency of the evidence that would justify instructing the jury on willful blindness, we consider Stewart's claim that the district court's instruction on willful blindness was erroneous as a matter of law. The full instruction reads:

> The government can meet its burden of proving fraudulent intent not only by showing that a defendant knowingly lied but also by proving beyond a reasonable doubt that he acted with deliberate disregard of whether the statements were true or false or with a conscious purpose to avoid learning the truth.

> Stated another way, a defendant's knowledge of a fact may be inferred from a deliberate or intentional ignorance of or willful blindness to the existence of that fact. It is entirely up to you as to whether youfind any deliberate closing of the eyes and as to the inferences to be drawn from any such evidence.

> This guilty knowledge, however, cannot be established by demonstrating that the defendant was merely negligent or foolish. These legal concepts concerning proof of fraudulent intent apply to all the counts of the superseding indictment which allege fraud as an element.

Joint app. at 3031–32. Comparing this instruction to the one we approved in Stuart, we conclude that the district court's charge was sufficient to guard against the jury convicting Stewart under an objective standard of willful blindness. In fact, we consider the court's charge here more clearly to emphasize the distinction between objectively

22

foolish behavior and deliberate or intentional ignorance than the Stuart charge.

Moreover, the evidence justified the instruction. Stewart argued at trial that he lacked the intent to defraud because he relied upon the findings of solvency reported in state examinations and audit reports. But the evidence permitted the jury to conclude that this was simply not the case. The jury could have found that Stewart deliberately closed his eyes to what otherwise would have been obvious to him concerning the financial problems of these companies. Stewart could have recognized the likelihood of insolvency yet deliberately avoided learning the true facts. Therefore, the instruction was justified in this instance.

E. Did the district court fail to give the jury a proper
       unanimity charge?

Stewart argues that the district court violated his right to a unanimous verdict on all of the counts of the indictment by not giving a unanimity charge. However, we find this contention to be insubstantial because Stewart did not object to the unanimity instructions, and, in fact, if there had been error on the court's part concerning Counts 2, 4, 14, 16 through 19, and 22 (for mail and wire fraud), Stewart invited it by objecting to the government's proposed unanimity charge on those counts. Joint app. at 3053–54. Thus, Stewart has waived all of these issues on appeal, and we would reverse only if the court committed plain error in instructing the jury on the counts where Stewart did not invite the error. See United States v. Zehrbach, 47 F.3d 1252, 1260 (3d Cir. 1995) (general waiver); United States v. Console, 13 F.3d 641, 660 (3d Cir. 1993) (invited error).

In any event, we find no plain error in the court's charges, and indeed no error at all in the district court's unanimity instructions. We begin our discussion on this point with the mail and wire fraud charges inasmuch as they are the basis of the RICO and money laundering counts.

The court began early in its charge with a general instruction that "each of the 135 counts of the superseding indictment which are before you for decision . . . must be considered separately." Joint app. at 3010. Moving to the

23

specific mail and wire frauds charges, the court informed the jury that "each separate use of the mails or wires in furtherance of the scheme to defraud constitutes a separate offense or violation of the mail and wire fraud statutes." Id. at 3035.

This instruction followed the court's setting out of the four schemes alleged in the indictment. The court charged the jury that Counts 2, 4, 14, and 16 through 19 for mail fraud and Count 22 for wire fraud described a scheme to "defraud and to obtain money and property by wrongfully taking valuable assets from Summit . . . and [EBL]. . . ." Id. at 3024-25. The court distinguished this scheme from that set forth in Counts 24 through 32 for wire fraud that alleged a scheme "to deceive state insurance regulators involving reinsurance." Id. at 3025. The court then outlined the scheme "to defraud and obtain money and property by inflating Summit['s] . . . financial statements with overvalued promissory notes from its parent, its corporate parent, SNL Corp., in order to deceive regulators, the buyer and others regarding the true financial condition of the company" set forth in Counts 33, 36 through 73 and 76 through 118 for mail fraud. Id. at 3025-26. Finally, at the conclusion of its instructions, the court repeatedly admonished the jury that it was required to agree unanimously on "each count" of the indictment. Id. at 3049-3052. We find these instructions sufficiently clear to ensure that the jury understood that it must agree unanimously on each count of the mail and wire fraud allegations set forth in the indictment.

Likewise, the court's instructions concerning the RICO and money laundering charges were quite clear. In describing the alleged acts of racketeering, the court referred back to its instructions on the mail and wire fraud charges and later directed the jury that it "must unanimously agree on the identity of at least two of the same racketeering acts alleged to have been committed by [Stewart]." Id. at 3039-41. Similarly, the court again referred back to its instructions regarding the mail and wire fraud charges when instructing the jury on the money laundering counts. See id. at 3044, 3046. Thus, considering these instructions in their entirety, even if

24

Stewart had not waived the issue or invited the error, we would conclude that the court's instructions were clear on the unanimity issue.

Finally, we note that because the jury convicted Stewart on all 135 counts of the indictment, even if the district court erred in charging the jury on unanimity, such error would be harmless beyond a reasonable doubt. See United States v. Edmonds, 80 F.3d 810, 812–13 (3d Cir. 1996) (en banc). Inasmuch as the jury reached a unanimous agreement on each count, including those counts that were predicate offenses for RICO and the money laundering charges, it could not possibly have disagreed on any elements of the individual crimes. This case is simply not one in which some jurors relied on a fraudulent mailing while the others relied upon a fraudulent wire transfer in convicting on the RICO charges.

Contrary to Stewart's assertions at oral argument, Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078 (1993), does not preclude us from finding harmless error in this instance. The Supreme Court held in Sullivan that an erroneous reasonable doubt instruction cannot be harmless because this error calls the ultimate verdict of guilt into doubt. Id. at 280–81, 113 S.Ct. at 2082. As we recognized in Edmonds, while Sullivan concerned a situation where "an erroneous reasonable doubt instruction undermined all of the jury's findings, the jury in this case delivered valid findings on essentially all of the elements of the offense by convicting [the defendant] of every violation.. . ." Edmonds, 80 F.3d at 812. Thus, we do not doubt the validity of the jury's verdict here, nor do we question that this verdict reflects anything but its unanimous agreement on each element of each count of the indictment. Accordingly, we will affirm.

F. Did the district court err in concluding that the Account was not directly forfeitable?

We now consider two appeals from the October 6, 1998 forfeiture order. In the first, Stewart raises a number of challenges to the order, including a Sixth Amendment claim that the forfeiture prevented him from using the forfeited money to finance his criminal defense. Stewart's claims

25

depend on the assumption that the Account could be forfeited only as a substitute asset.6  We understand him to concede, however, that his claims on appeal must fail if the Account was directly forfeitable rather than forfeitable merely as a substitute asset and, in any event, that is the case. The government cross-appeals, claiming that the district court erred in failing to forfeit the Account directly under the relevant money laundering provision, 18 U.S.C. S 982(a)(1).

We will affirm the district court's judgment of forfeiture but will reverse the court's order finding that the Account was not directly forfeitable. Thus, we will modify the forfeiture order. Inasmuch as we agree with the government's argument that the Account was directly forfeitable as proceeds of a money laundering violation, we need not reach the issues Stewart raises.7

We begin our analysis of the district court's forfeiture order by considering the jury's verdict in this case. In its special forfeiture verdict, the jury declined to forfeit the Account as property acquired or maintained as a result of Stewart's RICO violations. But the jury did find Stewart guilty on Count 153, a money laundering count under 18 U.S.C. S 1957, which charged him with having withdrawn illegally $3 million from the account of Tartan Management.

_____

6. Stewart's claims are: (i) that because the Account was forfeitable only as a substitute asset, the district court had no power to restrain it from May 1998 to October of that year, the time between Stewart's request to lift the pre-trial restraints and the court's order forfeiting the Account as a substitute asset; (ii) that forfeiture of the Account under the substitute asset provision violates his Sixth Amendment right to counsel because he intended to use these funds to pay his post-conviction attorneys; (iii) that prior to entering the substitute asset forfeiture order, the district court failed to ascertain correctly the shortfall in the government's recovery of directly forfeited property; and (iv) that when his sentence, fine, restitution and forfeiture orders are considered together, the forfeiture of the Account as a substitute asset is excessive under the Eighth Amendment.

7. We review de novo as involving a legal question the district court's interpretation of the money laundering forfeiture provisions so as to forfeit the Account as a substitute asset rather than as criminal proceeds. See In re Assets of Martin, 1 F.3d 1351, 1357 (3d Cir. 1993).

26

In Count 157, the jury specifically forfeited these funds under 18 U.S.C. S 982. At the sentencing hearing in August, the Government used appropriate records to trace the $3 million forfeited by the jury to the Account. Yet, the district court concluded that, under United States v. Voigt, 89 F.3d 1050, the money in the Account could be forfeited only under the substitute asset provision. While we understand why the district court reached this conclusion, we find its ruling erroneous because the facts of Voigt are distinguishable from the facts of this case.

In Voigt, the government sought to forfeit directly jewelry that a defendant had purchased with funds from an account in which money laundering proceeds had been commingled with other funds. See 89 F.3d at 1081. There had been numerous intervening deposits and withdrawals between the deposit of the tainted money and the purchase of the jewelry. See id. Considering these facts, we concluded that the government simply could not show by a preponderance of the evidence, as it was required to do under the money laundering statute, that the jewelry was "involved in" or "traceable to" the defendant's illegal activity. See id. at 1082 (citing the money laundering direct forfeiture provision, 18 U.S.C. S 982(a)(1)). Moreover, we stated that an interpretation of the statute allowing the government to forfeit directly the jewelry would force the court to ignore the substitute asset forfeiture provision, which specifically provides for the forfeiture of property as a substitute asset when property involved in or traceable to the criminal activity "has been commingled with other property which cannot be divided without difficulty." See id. at 1085 (citing the substitute asset provision, 21 U.S.C. S 853(p)(5), incorporated into the money laundering statute).

This case, however, presents quite different facts. First, the government is not seeking to forfeit property purchased with commingled funds. Thus, we are not dealing with property analogous to the jewelry in Voigt. Instead, after tracing the $3 million transfer to the Account, which previously contained only $160,000, the government seeks to forfeit directly the remaining approximately $2.6 million. Second, this case does not involve numerous withdrawals

27

and deposits from and into an account containing commingled funds because almost immediately after Stewart transferred the $3 million into the Account, the court restrained withdrawals from the Account. Since that time, the only withdrawal from the Account was the $600,000 that the government agreed to allow Stewart to use to pay his trial attorney.

The single withdrawal aside, the question posed by this appeal is whether the government may forfeit directly tainted funds from an account that has been frozen from the time of the illegal transfer but that also contains untainted money. It is true that Voigt appeared to answer this question in the negative: in a footnote, the court stated that the substitute asset provision would have to apply to commingled cash even if "one readily could separate out the amount subject to forfeiture." 89 F.3d at 1088 n.24. But this statement in Voigt is dicta because Voigt was not a case in which "one readily could separate out the amount subject to forfeiture." Accordingly, the holding of Voigt does not require us to find against direct forfeiture in this case.

Indeed, if we were to rule against direct forfeiture in this case our holding would contradict congressional intent as expressed in the money laundering forfeiture statute. Property is directly forfeitable under that statute when it is "involved in" or "traceable to" the defendant's illegal activity. 18 U.S.C. S 982(a)(1). Here, the government clearly traced laundered funds forfeited by the jury to Stewart's Account. Stewart does not contest this tracing, which in any event the government clearly established. Moreover, the substitute asset provision of the statute applies only when commingled property cannot be "divided without difficulty." 21 U.S.C. S 853(p)(5).

The Voigt panel surely was accurate when it concluded that the substitute asset provision must be used "once a defendant has commingled laundered funds with untained funds . . . such that they `cannot be divided without difficulty.' " 89 F.3d at 1088 (citing 21 U.S.C. S 853(p)(5)). We do not see any difficulty, however, in separating out the tainted $3 million from the untainted $160,000 that the Account contained. There would be a difficulty only if one were to attach significance to which actual bills were left in

a defendant's account after the direct forfeiture; certainly a defendant has no legitimate interest in preferring one dollar bill to another as long as he is left with the same amount of legitimate funds.

Neither does the fact that the government agreed to the withdrawal of $600,000 from the Account to finance Stewart's trial defense affect our direct forfeiture analysis. As the government made clear at oral argument, Stewart agreed that untainted money would be deemed withdrawn first. Because the Account contained only $160,000 of untainted funds, Stewart already has used the funds in the Account to which he was entitled legitimately. We therefore conclude that the remaining approximately $2.6 million in the Account should be forfeited directly to the government under the money laundering forfeiture provision, 18 U.S.C. S 982(a)(1).

IV. CONCLUSION

For the foregoing reasons, we will modify the district court's October 6, 1998 forfeiture order so that the forfeiture is direct rather than of a substitute asset. As modified, we affirm the forfeiture order and we will affirm the judgment of conviction and sentence entered August 13, 1998, and all other orders on appeal.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit