NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2260
_____

UNITED STATES OF AMERICA

v.

MATTHEW PUCCIO,
                            Appellant
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 2-21-cr-00157-001)
District Judge:  Honorable John M. Vazquez
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 3, 2024

Before:  JORDAN, HARDIMAN, and PORTER, *Circuit Judges*

(Filed: September 6, 2024)
_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Matthew Puccio appeals his conviction and sentence for conspiracy to commit

healthcare fraud.  He contends that the District Court erred in instructing the jury on

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

willful blindness, and that the Court should not have applied a managerial role enhancement pursuant to Sentencing Guideline § 3B1.1. Neither argument has merit. Accordingly, we will affirm.

## I.  BACKGROUND

### A.  The Scheme

Puccio worked as a sales representative for Rep Network ("RN"), a marketing company for prescription compound medications,[1] including topical pain and scar creams and vitamin supplements. Compound medications must be prescribed by a doctor. Because not all medical plans cover the cost of these expensive medications, RN and compounding pharmacies targeted individuals with health insurance plans that covered compounded medications. The New Jersey School Employees' Health Benefits Program (the "SEHBP"), which provided medical and prescription drug coverage to qualified public school employees, was one such plan.

Puccio received a commission for every prescription he caused to be filled, as well as any filled prescriptions generated by sales representatives he recruited. To increase commissions, and because he knew their insurance plan would cover the medications, Puccio persuaded his brother-in-law, Peter Frazzano, and other New Jersey public school

---

[1] Compounded medications, which are produced by a pharmacist or physician, are mixed ingredient medications or medications tailored to the needs of an individual patient. They can be used to accommodate patients who cannot be treated with standard medications, such as someone who is allergic to a dye and needs the medication to be made without it or a small child who cannot swallow a tablet and so needs a liquid dose.

educators to receive compounded medications.[2]  Eventually, Puccio recruited Frazzano to become a sales representative for RN, which also increased Puccio's potential commissions.  He taught Frazzano to increase commissions by, for example, focusing on the highest-yield medications and maximizing prescription refills.

Puccio and Frazzano discussed recruiting schoolteachers in Frazzano's school as "patients" to receive medications because they knew SEHBP would cover the costs of the compounds.  Puccio also instructed Frazzano to find a doctor who would sign teachers' prescriptions, which led them to Dr. Gregg Marella.  Puccio and Frazzano treated Dr. Marella to multiple dinners, bringing along pre-filled prescriptions for the schoolteachers for Dr. Marella to sign, even though Marella had never examined those patients.  During one of those dinners, Puccio and Frazzano bribed Marella with $500 in cash to continue the fraudulent operation.

In other words, Puccio profited by causing false and fraudulent prescriptions for unnecessary compound medications to be filled, resulting in fraudulent claims to health insurers, including the SEHBP.  Through the scheme, Puccio caused the SEHBP to lose more than $2.6 million it paid for medically unnecessary and fraudulent prescriptions, and Puccio made approximately $215,000 in commissions on those prescriptions.

In September 2017, the FBI questioned Frazzano about the scheme.  Immediately following that conversation, Frazzano contacted Puccio, who went to Frazzano's home.

---

[2] Typically, to incentivize the recipients to continue to receive the medication, Puccio covered the costs of any co-payments that recipients incurred.

3

Puccio spoke to the president of RN and then told Frazzano to call the teachers that they had recruited and tell them to lie to the FBI by saying that they saw a doctor and were prescribed the medications and that no one paid them to do so. Puccio also told Frazzano to delete all communications on his phone related to the scheme, but when Frazzano was too nervous to comply, Puccio took Frazzano's phone and deleted that content himself.

### B.    The Defense

Puccio was indicted and convicted of conspiracy to commit healthcare fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349. At trial, Puccio testified that he did not know about any fraudulent activity. He denied recruiting Frazzano as a sales representative, claiming instead to have only introduced him to another sales representative and not knowing what happened afterwards. Contrary to testimony from both Frazzano and Dr. Marella, Puccio also denied completing prescription forms with patients' information before giving them to Dr. Marella to sign.

Based on Puccio's defense that he was not aware of the scheme to commit healthcare fraud, the government requested that the jury be instructed on willful blindness. Over Puccio's objection, the District Court granted the government's request to include the instruction, and charged the jury using our model instruction. The jury returned a guilty verdict.

### C.    Sentencing

Prior to sentencing, the government recommended a three-level enhancement under § 3B1.1(b) of the guidelines for Puccio's role as a manager or supervisor (but not an organizer or leader) of criminal activity involving five or more participants. Puccio

4

objected to the enhancement, arguing that he was not the "architect" of the scheme and that no one worked for, or under, him. After hearing argument on the issue at sentencing, the District Court found that Puccio recruited Frazzano into the scheme; Puccio stated in emails that Frazzano worked under him; Puccio directed Frazzano to find other teachers to be patients and covered their co-pays; and Puccio managed Frazzano's attempted cover up following the FBI interaction. Based on those facts, the Court found that Puccio supervised Frazzano but applied a two-level sentencing enhancement under U.S.S.G. § 3B1.1(c) rather than a three-level enhancement under subsection (b).

That enhancement resulted in a guidelines range of 78 to 97 months' imprisonment. The government recommended a downward variance to between 60 and 72 months, and Puccio asked the Court to consider that variance while also asking for a greater downward variance. Ultimately, the Court granted the government's requested variance and imposed a term of 60 months' imprisonment, followed by three years of supervised release. Puccio timely appealed.

## II. DISCUSSION[3]

Puccio first argues that the District Court erred in providing a jury instruction on willful blindness, and that the charge as a whole was confusing and contradictory. He

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. "We exercise plenary review over whether a willful blindness instruction properly stated the law. We review a district court's determination that the trial evidence justified the instruction for abuse of discretion and view the evidence and the inferences drawn therefrom in the light most favorable to the [g]overnment." *United States v. Stadtmauer*, 620 F.3d 238, 252 (3d Cir. 2010) (citations and internal quotation marks omitted). "[W]hen we consider jury instructions[,] we consider the totality of the instructions and not a particular sentence or

also argues that the District Court clearly erred when it applied a managerial role enhancement pursuant to § 3B1.1(b) of the guidelines.  He is mistaken on both issues.

## A.    The District Court did not err in providing the willful blindness instruction.

The District Court instructed the jury that Puccio's conspiracy charge required the government to prove that:  (1) two or more persons agreed to commit healthcare fraud, (2) Puccio was a party to or a member of that agreement, and (3) Puccio joined the agreement or conspiracy knowing of its objective to commit healthcare fraud, and intended to join together with at least one other conspirator to achieve that objective.  Thus, the jury had to find that Puccio "had knowledge of the specific objective contemplated by the … conspiracy." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (en banc).  Because "willful blindness is a subset of knowledge[,]" and "an alternative way of proving knowledge[,]" "proof of willful blindness [can be] sufficient to prove knowledge[.]" *United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 ex rel. Goodman*, 43 F.3d 794, 813 (3d Cir. 1994).  "Thus, the government could satisfy the [charge's] knowledge requirement by demonstrating actual knowledge or willful blindness, which is a subjective state of mind that is deemed to

___

paragraph in isolation." *United States v. Khorozian*, 333 F.3d 498, 508 (3d Cir. 2003), *as amended* (Aug. 25, 2003).  "Review of the District Court's factual findings in support of the organizer-leader enhancement proceeds under the clear error standard[.]" *United States v. Adair*, 38 F.4th 341, 347 (3d Cir. 2022).  Clear error does not exist unless the Court's ruling was "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *United States v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007), *as amended* (Aug. 10, 2007).

satisfy a scienter requirement of knowledge." *Caraballo-Rodriguez*, 726 F.3d at 420 n.2 (internal quotation marks omitted).

"[A] willful blindness charge does not lower the government's burden of proving intent as long as it emphasize[s] the necessity of proving a subjective awareness." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999) (second alteration in original) (internal quotation marks omitted). "If the charge satisfies this standard, and is supported by sufficient evidence, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *Id.* Thus, those are not contradictory or mutually exclusive theories, as Puccio argues, but alternative theories. "This is so because, if the jury does not find the existence of actual knowledge, it might still find that the facts support a finding of willful blindness." *United States v. Wert-Ruiz*, 228 F.3d 250, 252 (3d Cir. 2000).

At trial, Puccio introduced evidence that could have permitted a jury to conclude that he deliberately closed his eyes to the submission of fraudulent prescriptions, and thus the jury heard facts that supported the willful blindness instruction. Puccio testified that he gave Dr. Marella blank prescriptions. But he admitted that he knew Frazzano recruited teachers to be "patients", that he attended dinners with Dr. Marella, and that Marella signed prescriptions that Puccio made money off of. Alternatively, Frazzano testified that Puccio participated in filling out prescriptions before handing them to Dr. Marella in envelopes with a cash bribe. And Dr. Marella also testified that he received pre-filled prescriptions from Puccio, which supported the government's primary actual knowledge theory.

7

Thus, a jury could have credited Puccio's testimony and found insufficient evidence of actual knowledge, but it also could have accepted the testimony of Frazzano, Marella, and the trove of other government witnesses[4] to conclude that, at a minimum, Puccio's conduct evidenced willful blindness. Accordingly, because there was sufficient evidence to support the willful blindness theory, the District Court did not err by instructing the jury on both willful blindness and actual knowledge. *Stewart*, 185 F.3d at 126.

Puccio also argues that the instruction was erroneous because, "while willful blindness may be used to establish knowledge, it cannot be used to establish intent to enter into an unlawful agreement." (Opening Br. at 24.) But the District Court's willful blindness instruction, which matches our model instruction, clearly and accurately explained that willful blindness could be a substitute for knowledge and did nothing to create the impression that it pertained to purpose or the element of intent. 3d Cir. Model Crim. Jury Instruction 5.06. In fact, the Court specifically emphasized that, "[e]ven

---

[4] Other government witnesses who testified about Puccio's involvement in the scheme included: Dr. Agresti, another doctor who signed pre-filled prescriptions, who said that he received the prescription forms from the sales representatives he worked with and signed prescriptions for several patients – including patients who Puccio brought in – without ever examining them; "patients" who testified that they did not complete forms associated with their compound prescriptions, and that they received those medically unnecessary medications without being examined by a doctor, and that their co-pays were reimbursed by Frazzano, Puccio's recruit; a bank records custodian who authenticated Puccio's incriminating transactions, like the dinner with Dr. Marella, and patient co-pay reimbursements; and an FBI Special Agent who testified as to Puccio's incriminating phone records (calls, texts, location) immediately after the FBI confronted Frazzano about the scheme.

though it has the same word as willfully, … willful blindness is different.  It's a substitute for knowledge … I just want to make sure we keep those distinct." (J.A. at 1276.)  Thus, "[t]he Court's instructions made clear that willful blindness applied only to the element of knowledge[,]" *United States v. Stadtmauer*, 620 F.3d 238, 258 (3d Cir. 2010), and so they were appropriate and correct.[5]

**B.      The District Court did not clearly err in applying a manager role enhancement under the guidelines.**

Puccio also challenges the District Court's imposition of a role enhancement pursuant to § 3B1.1(c) of the guidelines.  Section 3B1.1(c) provides for sentencing enhancement of a defendant "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)[.]"[6]  "For the … enhancement to apply, the evidence must show [by a preponderance of the evidence] that [the defendant] exercised some degree of control over at least one other person involved

---

[5] Alternatively, to the extent Puccio argues that it is not possible for one to be willfully blind to participate in a conspiracy, we have previously rejected that exact argument in *United States v. Anderskow*, 88 F.3d 245 (3d Cir. 1996).  In *Anderskow*, we affirmed a conspiracy conviction where "the jury had ample evidence with which to conclude that, at a minimum, [the defendant] had willfully blinded himself to the fact that" a criminal conspiracy existed.  88 F.3d at 254.  That is the same basis on which the willful blindness instruction was given here.

[6] Subsections (a) and (b) require more severe sentencing enhancements when "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," or when "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," respectively.  U.S.S.G. § 3B1.1(a)-(b).

in the offense." *United States v. Raia*, 993 F.3d 185, 192 (3d Cir. 2021) (second alteration in original) (internal quotation marks omitted).

Puccio argues that the District Court should not have applied the role enhancement because he was not the "architect" of the scheme and other co-conspirators had roles more senior than his. (Opening Br. at 29.) The fact that Puccio himself had managers and supervisors does not, however, erase the evidence that he was a manager or supervisor of others; and there is ample evidence in the record that supports the District Court's finding that Puccio managed or supervised at least one other person – Frazzano. Frazzano testified that Puccio approached him about joining the company and that he was "underneath" Puccio, so Puccio would be compensated for any prescriptions Frazzano had produced, "almost like a downline effect." (J.A. at 510.) At one point, in an email to other co-conspirators, Puccio even explicitly stated that Frazzano "works directly under me." (J.A. at 1132.) Furthermore, Puccio directed Frazzano to find doctors and patients, and Puccio was the "knowledgeable" one that Dr. Marella went to with questions. (J.A. at 626.) Finally, after the FBI knocked on Frazzano's door, it was Puccio who directed Frazzano to delete the information related to compounding on his phone and to instruct "patients" to lie to the FBI.

Because there was sufficient evidence to find that Puccio "exercised some degree of control over at least one other person involved in the offense[,]" *Raia*, 993 F.3d at 192, the District Court did not clearly err in applying the two-level enhancement.

III.   CONCLUSION

For the foregoing reasons, we will affirm Puccio's conviction and sentence.

10